## CLAPP v. STATE.

### (*Knoxville.*   March 4,   1895.)

1. ACCOMPLICE.   *Correct definition of.*

   An accomplice is correctly defined to be a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime.   (*Post, p. 194.*)

2. SAME.   *What corroboration essential.*

   It is not essential that the corroboration of the testimony of an accomplice should be equivalent to "the swearing of one credible witness." The corroboration is sufficient that satisfies the jury of the truth of the accomplice's statements. It must confirm the accomplice's statements, not only as to the commission of the offense, but as to the defendant's connection with the crime.   (*Post, pp. 194–196.*)

   Cases cited and approved: Robison v. State, 16 Lea, 146; Hall v. State, 3 Lea, 564; 104 N. Y., 591; 34 Am. R., 391; 109 N. Y., 267.

3. CRIMINAL PRACTICE.   *Cross-examination of defendant.*

   The defendant in a criminal case cannot be compelled to answer on cross-examination over his objection whether he had committed an offense other than that for which he is on trial, (*Post, pp. 199–201.*)

4. SAME.   *Subjecting jury to improper influences.*

   When the jury in a criminal case has been exposed, in its selection and during the trial, to improper influence, this Court will reverse, in the absence of the fullest and most satisfactory explanation, although it may not affirmatively appear that defendant suffered any prejudice.   (*Post, pp. 201, 202.*)

FROM CLAIBORNE.

Appeal from Circuit Court of Claiborne County. W. R. HICKS, J.

W. A. Owens and W. P. Gillenwaters for Clapp.

Attorney-general Pickle for State.

McAlister, J. The plaintiff in error was indicted in the Circuit Court of Claiborne County for the murder of James. Cunningham. At the May term, 1894, of said Court he was put upon trial, convicted by a jury of the crime of murder in the first degree, and sentenced by the Court to suffer death by hanging. The prisoner· appealed.

On Sunday evening, December 3, 1893, the body of James Cunningham, a respectable white citizen of Claiborne County, was found on the floor of his late residence. The deceased was a single man who had never been married, and lived by himself in an unpretentious dwelling in an out of the way place, about twenty feet from the Hooper road. He was an industrious man, and had accumulated some property, consisting of land, hogs, cattle, and money. Prior to his death he was known to have three hundred dollars in paper currency, a purse of silver, and a small amount of gold. The sum of $55 in gold was found in his house after he was killed. When discovered, the deceased was lying on the floor, his head, still covered with his hat, was resting on his wrist with a part of the hat between his head and left ·arm. His face was bloody, and there was a bullet wound in his head and a corresponding perforation in the hat. This wound was

in the back of the head, and there was a wound in the lower jaw, where the bullet had passed out. There were also two bullet holes in the left breast, and one in the back. Two bullets were found in the room, one imbedded in a log and one lying upon the floor. The pockets of the clothing worn by the deceased were all turned out, excepting one, which was the left-hand pants pocket. The brother who discovered the body had last seen the deceased on Thursday evening, when the latter had called at the former's house for a horse to go to mill. The discovery of the body was in December. The weather was cold, but the door to the residence of the deceased was found open.

Some circumstances in respect to the appearance of the body and of the room will be mentioned, which will cut a figure in the investigation of the case. When the body was found, there was in the right-hand a small account book and part of a twist of tobacco. The deceased had on his shoes, but they were untied. The room had one bed in the corner; a trunk set near the bed by the wall; the key was in the lock, and the trunk had the appearance of having been opened. There was a lamp without a chimney on the end of the table, the cap of the burner was turned back, and the lamp had burned out, and there was no' fire in the grate.

Shortly after the discovery of the homicide, one Dobb Moore was arrested on suspicion as the

perpetrator of the crime, and upon the examining trial was bound over to the Circuit Court. Counsel for Moore then prepared a petition for *habeas corpus*, which was presented to Judge Hicks, and the writ granted, but before the trial it was agreed by counsel for the prosecution that Moore might be discharged. It is proper to say this record discloses no fact or circumstance directly or remotely connecting Moore with the murder.

About January 1, 1894, and two or three weeks after the trial of Moore, one M. F. Edington and Sallie Margraves, a disreputable woman, were arrested, charged with this murder, but pending his examination by the Justice, and for insufficiency of evidence, the prosecution agreed that Edington might be discharged. The only incriminating evidence against Edington was his intimacy with Sallie Margraves, and his supposed guilty knowledge of the crime. Sallie Margraves was examined as a witness on the preliminary hearing of the case against Edington, and swore that she knew nothing of the murder of James Cunningham. After her examination, and when Edington had been discharged by the Magistrate, Sallie Margraves made a statement charging the defendant, Paris Clapp, with the murder, and detailing in full the circumstances attending it. Her statement led to the arrest of the defendant, Paris Clapp, who was bound over by the Justice, subsequently indicted by the grand jury, and convicted of the crime by the Circuit Court.

Sallie Margraves testified on the trial of the de-
fendant, viz.: "I live about a mile and a half
from Tazewell, and have known Paris Clapp since
he was a child. I knew James Cunningham, the
deceased, and lived one half of a mile from him.
On November 30, 1893, about nine or ten o'clock
A.M., I saw Paris Clapp at my father's. Clapp
and myself made an arrangement to meet that night
at the forks of the road, near my father's house,
and go over to my mother's house. We met a
while after dark; talked a little; it was cold; so
Clapp proposed to go to James Cunningham's to
get some apples. We went, and found James Cun-
ningham sitting in front of the fire. He gave us
seats, placed some kindling on the fire, and seated
himself on a churn, to the right of the fireplace.
We reached Cunningham's house about seven o'clock,
and remained until nine o'clock. While there, Clapp
asked Cunningham if he ever became lonesome, and
why he did not marry. Cunningham replied that
he was not able to take care of a woman. Clapp
asked Cunningham if he had any water. He re-
plied, 'Yes,' and that it was outside the door.
Clapp then got up to get some, and Cunningham
said: 'You had better take the lamp.' Clapp re-
plied: 'I can find it.' Clapp went out, and then
I heard the dipper rattle in the bucket. He then
walked down toward the lower end of the porch,
and came back to the door, with his pistol in his
hand; presented it at Cunningham, and said: 'Keep

your seat; all I want is your money.' Cunning-
ham replied, 'I have got no money,' to which Clapp
replied: 'I know you have.' Cunningham said: 'I
took my gold and left it at New Tazewell, in John
Bin's safe, and I have loaned my greenbacks to
John Davis.' Clapp then ordered him turn his
pockets, and Cunningham said: 'Paris, are you going
to murder me? I will give you a ten dollar bill
if you will go off and let me alone.' Clapp says:
'I want it all, and I am not going to wait much
longer.' Cunningham then put his hand in his left
pants pocket, and pulled out a small pocketbook.
Clapp says: 'You give that pocketbook to that girl
[referring to Sallie], or throw it on the table.'
Cunningham threw it on the table. Clapp told me
to pick it up. I did so. Cunningham said: 'Sal-
lie, give me back my notes; you wont need the
notes.' Clapp said: 'Yes; give them to him,' and
I did so. Clapp then told me to look in the
trunk. I looked in the trunk, and found a suit
of clothes, some cotton goods, and a bill book, but
found no money. Clapp says: 'Put them things
back good.' He then told me to turn down the
bed, and 'look good for money.' I turned the bed
down, but still found no money. I then placed
the bed back as well as I could. Then Clapp says:
'James, do you ever pray?' I was scared, and
ran out of the room. As I started out at the
door, Clapp says: 'Don't leave here, or I will kill
you.' After I got out at the door one shot was

fired, and I heard Cunningham say: 'Lord, have mercy on me!' I don't know whether I went off the porch or not. Then Clapp shot him twice more. Clapp then came out of the house and told me to run. I ran out of the road. Clapp says: 'If you ever tell this, I will kill you, or some of my friends will kill you.' I says: 'Clapp, ain't you ashamed to treat me this way? James Cunningham was a good neighbor boy, and a special friend of mine.' I says: 'Clapp, where do you expect to go when you die?' and he says, 'To hell, if there is such a place.' When we got on top of the ridge, near my father's, the train blew for New Tazewell, and it was due there at quarter past nine o'clock. When we got down to my mother's, Clapp stopped, took the hulls out of his pistol, and put them in his pocket. We listened, went up to the house, peeped through the cracks, and saw John Upton and Jim Carroll in my mother's house. Clapp told me not to look scared or excited, but to be cool, as if nothing had happened. We went into the house, and soon Carroll and Upton left. After they had been gone some time, Clapp said that he had lost something. He took the light, and he and I went under sister Barbary's room. Then he asked me for the money, and I gave it to him. He counted it, and said there was $118. He gave me $63 to keep, and told me not to spend any of it, but to bury it all, for it might be marked. We then came round to the door. Mother asked

him if he had found it (what he pretended to have lost). He said he had, and then went off. It was then about eleven o'clock."

The witness also stated that on the night after Edington was discharged by the Magistrate, she took the lawyers in the case and Sheriff Campbell to the woods, where she had buried the money, and dug it up. "Sheriff Campbell," she said, "scratched down by a stump, and dug up a goblet with money in it," which he now has in his possession.

Sallie Margraves also testified that the night James Cunningham was murdered was cold; that there was a good bed of coals in the fire-place; that they left the lamp burning, on the table; that the lamp had no chimney, and also that the top was turned back. She further stated that, when the deceased turned his pants pocket out, in obedience to the command of Clapp, Cunningham kept his day-book and his tobacco in his right hand. We have already stated that the lamp and the position of the body were found as described by Sallie Margraves when she left the Cunningham house.

We have thus recited the whole testimony of Sallie Margraves, for the reason that it is insisted by counsel for the prisoner that his conviction has been rested upon the evidence of this witness; that she was an accomplice in the crime, and that her testimony is uncorroborated. In this connection, it is assigned as error that the Circuit Judge failed to give a proper charge on the subject of an accom-

13—10 P

plice. The Court said to the jury, viz.: "An accomplice is defined to be a partner or an associate in crime, or a partner in guilt. If, in this case, you find that the witness was willingly participating or taking a part in the killing of deceased, then, in law, she was an accomplice. She would not be a participator in the killing simply by being present for some other purpose, and that without willingly participating in the killing. What the truth is as to what was her purpose and what she did, I now submit to you upon the proof. If, as a fact, you find her to have been an accomplice, then you are told that you should not convict the defendant alone upon her evidence. To warrant a conviction, her evidence must be corroborated or supported. This corroboration must be such as satisfactorily amounts to the swearing of one credible witness, either in direct evidence or from facts and circumstances. It must be such corroboration as satisfies you that she is telling the truth, not only as to the fact of the killing, but to the fact that the defendant did it."

We find no reversible error in this charge. It was certainly more favorable to the defendant than the law warranted, when the Court instructed the jury that the corroboration must be equivalent to one credible witness. Such proof would suffice and support a conviction without the testimony of the accomplice. An accomplice is defined to be a person who knowingly, voluntarily, and with common intent

with the principal offender, unites in the commission of a crime.   Wharton on Evidence, Sec. 440.

The rule is, that, to sufficiently corroborate the testimony of the accomplice, there should be some fact testified to entirely independent of the accomplice's evidence, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it.   The corroboration must consist in some fact or circumstance that affects the identity of the party accused. The reason is, that a person who has been guilty of a crime himself will always be able to relate the facts of the case, and if the confirmation be only on the truth of that history, without identifying the person, that is really no corroboration at all.   Says Mr. Wharton: "The corroboration requisite to validate the testimony of an alleged accomplice should be to the person of the accused.   Any other corroboration would be delusive, since, if corroboration in matters not connecting the accused with the crime were enough, a party who, in the case against him would have no hope of escape, could, by his mere oath, transfer to another the conviction hanging over himself." Wharton on Evidence, Sec. 442.

The degree of evidence which shall be deemed sufficient to corroborate the testimony of the accomplice, is for the determination of the jury.   The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not

rest entirely upon the evidence of the accomplice. *People* v. *Everhardt*, 104 New York, 591; *Com.* v. *Holmes*, 34 Am. Rep., 391; *People* v. *O'Neal*, 109 New York, 267; 3 Rice on Evidence, Sec. 324." To the same effect are our own authorities: *Robinson* v. *The State*, 16 Lea, 146; *Hall* v. *State*, 3 Lea, 564.

What, then, are the facts and circumstances relied on by the State, independent altogether of the evidence of the accomplice, which, taken by themselves, tend to connect the defendant with the commission of the crime?

Barbara Margraves, a sister to Sallie, corroborates the statement of Sallie, that when she and Clapp returned that night they procured a lamp and went under the house and divided the money. Barbara states that she had retired for the night; that a light under her floor attracted her attention; that she slipped out of bed, got on her knees, and looked through a crack in the floor; that she saw Paris Clapp and Sallie Margraves under the floor; that Paris had some paper money, and that it looked to be "right smart."

This woman's character was attacked, as was also that of Sallie Margraves, for lewdness, but the character of both for truth was sustained by a number of reputable witnesses. J. C. Campbell, the Sheriff of the County, examined the premises of Eliza Margraves, and sustained Barbara's statement that there was a crack in the floor through which objects below could be distinctly seen.

Another fact disclosed in the proof is that shortly

before the murder the prisoner, who was working on a farm at wages of ten dollars per month, had no money, and was attempting to borrow money to purchase a suit of clothes. After the murder he displayed money to several persons, and seemed to be supplied. He paid some bills and presented a five-dollar gold piece to Nell Essary as a birthday present. The defendant also exhibited a five-dollar gold piece at a shooting match for some turkeys.

J. C. Carr says Clapp commenced to work for him October 24 at ten dollars per month. "Before Cunningham's death, Paris asked me often for money to buy a suit of clothes; after Cunninghams's death he said he had the money to buy the clothes, but not to let his folks know it. Clapp was always a working boy—good hand—never idling about. Said he wanted to pay me for his father's coffin, which I had furnished."

H. T. Campbell, a merchant at Cumberland Gap, testified that, about December 6, 1893, he sold Paris Clapp a suit of clothes for ten dollars; underwear, three dollars and sixty cents.

W. A. Johnson, a merchant of Tazewell, stated about December 1 Paris paid him his store account; that Clapp handed him a ten-dollar bill and he gave him back the change; that he left a large pistol in witness' store. Clapp's pistol was found to be a 44-caliber, and a ball of that size was found in Cunningham's house.

Millard Meyers changed five dollars for Paris ten days after Cunningham was killed.

Another fact tending to fix guilty knowledge upon the defendant is found in the testimony of John Upton. This witness testifies that, one night during the week preceding the discovery of the body on Sunday, he and James Carroll were at the house of Eliza Margraves; that Paris Clapp and Sallie Margraves came to the house together between nine and ten o'clock; that Paris and James Carroll talked at the door secretly, and witness heard one of them say, "Into hell he hops!" Again, it appears that while Sallie Margraves was in jail, charged with this offense, she was permitted to visit the house one night under the charge of an officer, one James McMahan; that while there Paris Clapp came in, and, with the permission of the officer, stepped outside the door with Sallie; that the officer went to the door, and heard the defendant say, "Die with it in you, or die before you tell it!" The witness says that he may possibly be mistaken as to the language used by the defendant, but this is his best impression. Moreover, it appears that while the woman, Sallie Margraves, was in jail, the defendant visited her, and was also seen whispering to her while she was in the witness room. The woman testifies that on these several occasions he was threatening to kill her in case she should reveal the secret.

The jury discredited the testimony by which the

accused sought to establish the defense of an *alibi*, and, upon the facts and circumstances disclosed in the proof adjudged him guilty.

It is a much controverted fact in argument whether Sallie Margraves was in fact an accomplice in the commission of the crime. It is insisted by the Attorney-general that she was not an accomplice, but was present at the scene of the killing for a lawful purpose, and while there became the unwilling tool of the defendant in the execution of his plans of robbery; that she was terrorized by the drawing of the weapon, and her knowledge of the desperate character of the defendant, as well as by his threats then and afterwards, that he would kill her if she disobeyed him or should ever reveal the secret.

Without expressing an opinion in respect to the guilt of the defendant, as the case must be retried, we proceed to notice the other assignments of error.

It appears from the record that a reward was offered for the arrest and conviction of the assassin of James Cunningham. The defendant was arrested by one J. C. Campbell, the Sheriff of Claiborne County, who testifies that he expected to receive one-third of the reward, it not being shown who was to receive the remaining two-thirds. At any rate, the said Campbell swore out the warrant and was the prosecutor in the Justice's Court. In the Circuit Court, while not the prosecutor, the Sheriff was very active in getting up the testimony and in managing the case. Two days before the case was called

the defendant made affidavit of the interest and feel-
ing of the Sheriff in the prosecution, and moved the
Court to appoint an officer to summon the jury.
The Court thereupon made an order adjudging that
the Sheriff was disqualified and incompetent to sum-
mon the jury, and appointed one J. T. Longmore
a Deputy Sheriff for that purpose. Now, the er-
ror assigned is that, after the appointment of this
special Sheriff on account of the disqualification of
the regular Sheriff, the latter, the said J. C. Camp-
bell, gave to the special Sheriff thus apppointed the
names of three of the disqualified Sheriff's regular
deputies, to assist in summoning the jury. This
action of the disqualified Sheriff was not known to
the defendant until after he had been tried. The
defendant complains that the jury that tried him
were summoned in part by deputies suggested by
the regular Sheriff, and that, under the order of the
Court, he was entitled to a jury whose selection was
not directly or indirectly made by the disqualified
Sheriff. The special Sheriff made affidavit that no
juror was summoned by his deputies whose names
were furnished by the Sheriff, but there is no affi-
davit from the deputies whose names were suggested
by the regular Sheriff, that they were not influenced
in the selection of the jurors by the regular Sheriff.

In this connection, it is proper to notice another
assignment in respect to the misconduct of the Sher-
iff. It appears that the jury, during the progress
of the trial, were boarded at the house of the said

Campbell. The disqualified Sheriff and several jurors make affidavit that, while there, this Sheriff passed through the room two or three times. The Sheriff makes affidavit that he did not communicate with any of the jurors while in the room, and several of the jurors sustain him in this statement. The defendant, by counsel, complains that he has no guaranty that his trial was fair, when the jury is shown to have been summoned by deputies suggested by his former prosecutor, and then taken to board at his house, where they were accessible to communication by word or sign and every species of subtle influence.

Again, it is assigned as error that the Attorney-general was permitted, over the defendant's objection, to ask defendant, on cross-examination, if he had not killed a man in West Virginia, and if he had not killed two men in West Virginia. The defendant declined to answer whether he had killed one man in West Virginia, but did say that he had never killed two men in West Virginia.

The Court should have sustained the defendant's objection. It is true that, when a defendant in a criminal case takes the stand in his own behalf, he waives his right to protection against compulsory inculpation, and a refusal to answer any question pertinent to that investigation is ground for adverse inference. Greenl. on Evidence, Vol. I., p. 600, note g, and cases cited.

But this right of cross-examination and compul-

sory incrimination of the defendant does not extend
to collateral and independent crimes, having no direct
or remote connection with the case on trial.   In
respect to such matters, the defendant has a right
to claim his privilege from self-incrimination, and if
the fact about which he is interrogated forms but
one link in the chain of testimony which might con-
vict him of such independent crime, he is protected.
The tendency of the question in respect to the kill-
ing of a man in West Virginia was to criminate
the defendant or to expose him to a criminal pros-
ecution, and, the inquiry being wholly apart from
the present investigation, the defendant was privi-
leged from answering.   The Court was, therefore,
in error in overruling the defendant's objection.

We are constrained to believe that, on account of
the errors and irregularities disclosed in the record,
the prisoner has not enjoyed the benefit of a fair
and impartial trial guaranteed him by the Constitu-
tion and laws of the State.   In the selection of
the jury we can see it was in the power of the
disqualified Sheriff, through the instrumentality of
the deputies suggested by him to the special Sheriff,
to have filled the jury box with persons inimical to
the accused, or who at least would have been dom-
inated in their deliberations by the influence of the
Sheriff, who was so largely interested in the con-
viction of the prisoner.   It is not necessary that it
should affirmatively appear that the action was preju-

Clapp *v.* State.

dicial, it is sufficient that such misconduct might have prejudiced the rights of the prisoner.

In addition to this, it was a gross irregularity that the jury, while this case was pending, should have been boarded at the house of the Sheriff, and that the latter should have been permitted to pass through their room two or three times.

It results that, for these reasons, the judgment of the Circuit Court is reversed, and the cause remanded for a new trial.