IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 6, 2001 Session

## STATE OF TENNESSEE v. JEREMY MICHAEL SHELTON

**Direct Appeal from the Circuit Court for Henry County**
**No. 12888     Julian P. Guinn, Judge**

_____

**No.  W2000-00457-CCA-R3-CD  - Filed July 20, 2001**

_____

The defendant, Jeremy Michael Shelton, was convicted of theft of property over $10,000. The trial court imposed a three-year sentence. One year is to be served in continuous confinement and the remaining two years are to be served in Community Corrections. In this appeal of right, the defendant argues that the evidence was insufficient and that the sentence is excessive. The conviction is affirmed. The judgment is modified, however, to reflect that the confinement portion of the split sentence is to be served in the local jail.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified.**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Victoria L. DiBonaventura, Paris, Tennessee, for the appellant, Jeremy Michael Shelton.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; and Steve Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On the morning of January 6, 1999, employees of Joe Mahan Ford in Paris discovered that a 1996 Chevrolet Monte Carlo valued at $14,000 was missing from their used car lot. The dealership's policy with regard to used cars was for employees to place the keys in the ignitions in the morning and then secure the vehicles in the evening. Approximately one week before the theft, employees were unable to find the keys to the Monte Carlo. In consequence, the vehicle was secured for several days before it was returned to the lot for display. According to the sales manager, Larry Mahan, the defendant had visited the used car lot shortly before the Monte Carlo's keys disappeared. At the time of trial, Mahan did not remember whether the defendant test drove the Monte Carlo, however, and stated that any test driving logs from that time period would have been destroyed.

Mark Andrew Gottsacker, who described himself and the defendant as "best friends" at the time of the theft, testified that at approximately 1:00 a.m. on January 6, 1999, he accompanied the defendant, who was driving his 1993 Nissan, to the Joe Mahan Ford used car lot. Gottsacker stated that the defendant handed him the keys to the Monte Carlo, explaining that he had kept them after test driving the car earlier. Gottsacker testified that he unlocked the car by remote but that he and the defendant drove away because they saw some people in a parking lot across the street. He recalled that he and the defendant then exchanged seats and that when they returned to the dealership, the defendant exited the passenger side of the Nissan, entered the Monte Carlo, and drove the car to a field owned by Tri-Turf Sod, where both men had previously worked. According to Gottsacker, he and the defendant had obtained a license plate the day before from a disabled vehicle owned by Judy Hollingsworth, Gottsacker's fiancee. The defendant placed the tag on the Monte Carlo and left the car in the garage of an empty house owned by Ms. Hollingsworth. Gottsacker testified that two days later, he and the defendant drove the Monte Carlo to Eva Beach. He remembered that at that time, the defendant removed the "Crazy Playa" vanity license plate from his Nissan and placed it on the front of the Monte Carlo.

Gottsacker testified that shortly thereafter, he and the defendant made the decision to drive to Wisconsin to see his mother. Judy Hollingsworth and Heidi Engleman, the defendant's girlfriend, were also included in the trip. The group left at approximately 7:00 p.m. on January 8. Gottsacker and the defendant explained to the two women that they were test-driving the Monte Carlo. Gottsacker testified that he drove the Monte Carlo for almost all of the trip and that he initially took back roads to Paducah, Kentucky, before driving onto the interstate. On January 10, as Gottsacker, the defendant, and Ms. Hollingsworth were en route to pick up Ms. Engleman and leave Wisconsin, they were stopped by a state trooper. Gottsacker acknowledged having pled guilty to theft arising out of the incident and having received a Range I sentence of four years, with 120 days in confinement and the balance in Community Corrections. He also acknowledged that he had previously been convicted of two theft charges, burglary, and sale of marijuana.

Judy Hollingsworth testified that she first saw the 1996 Monte Carlo on the evening that she, Gottsacker, the defendant, and Ms. Engleman decided to travel to Wisconsin. When she asked about the car, the defendant and Gottsacker told her that they were borrowing it from a friend, Chris Fields. Ms. Hollingsworth recalled that Gottsacker drove the vehicle initially and that they took back roads through Tennessee. She recalled observing that the interior of the Monte Carlo was very clean and the defendant and Gottsacker responding that the vehicle had been detailed. When Ms. Engleman inquired about a paper floor mat under the front passenger seat, the defendant and Gottsacker replied that it had been left there when the car had been detailed. Ms. Hollingsworth testified that when the group stopped at a convenience store in Illinois, she and Ms. Engleman identified the license plate on the Monte Carlo as one previously belonging to Ms. Engleman. She recalled that the defendant and Gottsacker then explained that they were test-driving the car and that they had used the license plate because no plate had been provided with the car. Ms. Hollingsworth stated that later, when she and Ms. Engleman were alone at the home of Ms. Engleman's parents in Wisconsin, she suggested that Ms. Engleman call to check on whether the car was stolen. Within 48 hours, she, Gottsacker, and the defendant were stopped by the trooper. Ms. Hollingsworth remembered that when they saw

the officer's blue lights, the defendant said, "Shit," and, in response to a comment by Gottsacker, "Yeah, [this car] better not have been reported stolen." After Gottsacker stepped out of the car at the officer's request, Ms. Hollingsworth asked the defendant whether the car was stolen. The defendant nodded his head affirmatively and said, "I'm sorry." Ms. Hollingsworth confirmed that the "Crazy Playa" license tag belonged to the defendant.

Trooper Phillip Wenzel of the Wisconsin State Police testified that on January 10, 1999, acting on information received by a local sheriff's department from the police in Paris, Tennessee, he was on the lookout for a stolen white Z34 Monte Carlo with a Tennessee plate. While driving an unmarked patrol car, he observed the vehicle and stopped it. Gottsacker was driving at the time and Ms. Hollingsworth and the defendant were passengers. Because Ms. Engleman had already been taken into custody, she was not in the car. Trooper Wenzel stated that after impounding the car, he removed the Tennessee license tag from the rear of the vehicle and found a "Crazy Playa" specialty plate on the front of the car.

Darrell Renner, an Adams County, Wisconsin, Sheriff's Deputy, questioned the defendant. In his statement to Deputy Renner, the defendant denied stealing the Monte Carlo and contended that Gottsacker had claimed to have rented the vehicle to drive to his mother's home in Wisconsin. The defendant admitted that he had test-driven the vehicle several days prior to its being stolen, but denied that he had taken the keys. He also admitted that he and Gottsacker put Ms. Engleman's license plate on the car, explaining that Gottsacker told him that the dealership had not given him a license plate or sticker.

Heidi Engleman testified on behalf of the defense. She recalled that in January of 1999, Mark Gottsacker asked her whether she wanted to go to Wisconsin. When she asked whose car they would take, he replied that he would probably borrow one from a friend named Chris Fields. She stated that she left in the Monte Carlo with Gottsacker, Ms. Hollingsworth, and the defendant and drove the car for only a few minutes; otherwise, Gottsacker drove all the way to Wisconsin. Ms. Engleman remembered that in Illinois, Ms. Hollingsworth read the vehicle's license plate to her and she recognized the plate as one from a Mercury Cougar that she owned. She testified that once she reached her parents' home in Wisconsin, she called the sheriff's departments in Madison and Carroll Counties because she was suspicious that the Monte Carlo was stolen. Subsequently, a Wisconsin sheriff's deputy arrived at her parents' home and took her into custody. En route to the sheriff's department, they passed the stolen Monte Carlo. Ms. Engleman identified the "Crazy Playa" license plate as that of the defendant.

I

The defendant first contends that the evidence was insufficient. He claims that the testimony of Mark Gottsacker, an accomplice in the crime, was not adequately corroborated. We disagree.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835

(Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

A defendant cannot be convicted upon the uncorroborated testimony of accomplices. Sherrill v. State, 204 Tenn. 427, 433-35, 321 S.W.2d 811, 814- 15 (1959); Prince v. State, 529 S.W.2d 729, 732 (Tenn. Crim. App. 1975). An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime. Clapp v. State, 94 Tenn. 186, 194-95, 30 S.W. 214, 216 (1895); Letner v. State, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974). The rule is that there must be some fact testified to which is entirely independent of an accomplice's testimony; that fact, taken by itself, must lead to an inference that a crime has been committed and that the defendant is responsible therefor. State v. Fowler, 213 Tenn. 239, 245-46, 373 S.W.2d 460, 463 (1963). This requirement is met if the corroborative evidence fairly and legitimately tends to connect the accused with the commission of the crime charged. Marshall v. State, 497 S.W.2d 761, 765-66 (Tenn. Crim. App. 1973). Only slight circumstances are required to furnish the necessary corroboration. Garton v. State, 206 Tenn. 79, 91, 332 S.W.2d 169, 175 (1960). To be corroborative, the evidence need not be adequate in and of itself to convict. See Conner v. State, 531 S.W.2d 119, 125 (Tenn. Crim. App. 1975).

Theft of property occurs where, "with intent to deprive the owner of property, [a] person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-104. Obviously, Gottsacker's testimony established the elements of the crime. His testimony, in our view, was sufficiently corroborated by other evidence of the defendant's involvement in the theft. The defendant admitted to Deputy Renner that he test-drove the Monte Carlo shortly before it was stolen from the dealership lot. The defendant admitted to Judy Hollingsworth that the car was stolen and apologized to her for the incident. Finally, the defendant's distinctive personalized license plate, "Crazy Playa," was found on the front of the vehicle by Trooper Wenzel.

II

Next, the defendant argues that the trial court erred by ordering a sentence of split confinement because had he simply been sentenced to three years in the penitentiary, he would have been eligible for release after serving 30 percent of his three-year sentence, or approximately 10.8

months.[1]  He also complains that the trial court erred by not ordering a sentence of total probation and that he received a harsher sentence than did his accomplice, Mark Gottsacker.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct.  Tenn. Code Ann. § 40-35-401(d).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994).  "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls."  State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).  The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class C felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors.  Tenn. Code Ann. § 40-35-210(c).  If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range.  Tenn. Code Ann. § 40-35-210(d).  A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence.  Tenn. Code Ann. § 40-35-210(e).  The sentence must then be reduced within the range by any weight assigned to the mitigating factors present.  Id.

Especially mitigated or standard offenders convicted of Class C, D, or E felonies are, of course, presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary."  Tenn. Code Ann. § 40-35-102(6).  With certain statutory exceptions, none of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less.  Tenn. Code Ann. § 40-35-303(b).

Among the factors applicable to probation consideration are the circumstances of the offense, the defendant's criminal record, social history and present condition, and the deterrent effect upon and best interest of the defendant and the public.  State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).  The nature and circumstances of the offenses may often be so egregious as to preclude the grant of

---

[1]The defendant asserts in his brief that he would be eligible for release at approximately 10.4 months.  The defendant only has two days of pretrial jail credit, however, and this court's calculations result in a release eligibility date of 10.8 months.

probation.  See State v. Poe, 614 S.W.2d 403 (Tenn. Crim. App. 1981).  A lack of candor may also militate against a grant of probation.  State v. Bunch, 646 S.W.2d 158 (Tenn. 1983).

The purpose of the Community Corrections Act of 1985 was to provide an alternative means of punishment for "selected, nonviolent felony offenders in front-end community based alternatives to incarceration."  Tenn. Code Ann. § 40-36-103.  The Community Corrections sentence provides a desired degree of flexibility that may be both beneficial to the defendant yet serve legitimate societal aims.  State v. Griffith, 787 S.W.2d 340, 342 (Tenn. 1990).  Even in cases where the defendant meets the minimum requirements of the Community Corrections Act of 1985, the defendant is not necessarily entitled to be sentenced under the Act as a matter of law or right.  State v. Taylor, 744 S.W.2d 919 (Tenn. Crim. App. 1987).  The following offenders are eligible for Community Corrections:

> (1) Persons who, without this option, would be incarcerated in a correctional institution;
> (2) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
> (3) Persons who are convicted of nonviolent felony offenses;
> (4) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
> (5) Persons who do not demonstrate a present or past pattern of behavior indicating violence;
> (6) Persons who do not demonstrate a pattern of committing violent offenses; and
> Persons who are sentenced to incarceration or on escape at the time of consideration will not be eligible.

Tenn. Code Ann. § 40-36-106(a).

A sentence of split confinement involves the grant of probation after the partial service of a sentence.  Tenn. Code Ann. § 40-35-306(a).  It may include a jail or workhouse sentence of up to one year with the probationary term to extend for any period thereafter up to the statutory maximum for the offense.  Id.

Initially, the defendant was sentenced as a Range I offender to three years in the Department of Correction.  The trial court did not apply any enhancing or mitigating factors.  Three years is the minimum in the range.  See Tenn. Code Ann. §§ 39-14-105(4), 40-35-110 (making theft of property over $10,000 a Class C felony); 40-35-112(a)(3) (fixing Range I sentence for Class C felony at three to six years).  The trial court ordered that the defendant spend one year in confinement, citing the defendant's lack of candor as grounds for the denial of probation:

This is an appropriate case for alternative sentencing, and this Court orders the sentence served split, with one year of continuous confinement and the balance in the community corrections program.

This boy is a knowledgeable, willing leader and certainly a participant. You can't sell him as some kid green behind the ears that got led into a crime. He knew precisely what he was doing and he willingly and knowingly entered into it. He's not some child. It's a man here. . . .

In our view, the trial court did not err by denying immediate probation. Neither the defendant nor the state introduced any evidence at the sentencing hearing. At trial, however, the defense theory was that Mark Gottsacker was solely responsible for the theft of the Monte Carlo and that the defendant was an innocent bystander in the same position as Ms. Hollingsworth and Ms. Engleman. Thus, based on the defendant's lack of candor and his failure to accept responsibility for his crimes, despite overwhelming evidence that he had participated in the theft, the trial court properly found that some period of confinement was necessary. See State v. John Lee Hampton, No. W1999-00983-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., at Jackson, Dec. 6, 2000).

Because the trial court set the defendant's sentence prior to considering alternative sentencing, the judgment form reflects that the defendant received a three-year sentence in the Department of Correction with one year to be served in continuous confinement and two years to be served in Community Corrections. While a defendant sentenced to split confinement may be ordered to serve up to one year in continuous confinement, the time is to be served in the local jail or workhouse. Tenn. Code Ann. § 40-35-306(a). Accordingly, the judgment is modified to reflect that the defendant is sentenced to a total of three years: one year in the county jail followed by two years in Community Corrections.

The defendant argues that his sentence of split confinement violates the principles of sentencing because he would spend less time in continuous confinement had he been sentenced to the Department of Correction for three years and become eligible for release in 10.8 months. See Tenn. Code Ann. § 40-35-501(c) (setting release eligibility for Range I offenders at service of 30% of actual sentence). The state points out that eligibility for release does not equate to actual release.

In our view, the sentence of split confinement does not violate the principles of sentencing merely because the defendant may have to serve 1.2 months more than he may have had to serve in the Department of Correction. As the state correctly notes, the defendant would have no right to conditional release prior to the expiration of his Department of Correction sentence. Greenholtz v. Inmates of the Neb. Penal and Correctional Complex, 442 U.S. 1, 7 (1979); Daniels v. Traughber, 984 S.W.2d 918, 924 (Tenn. Ct. App. 1998); see Tenn. Code Ann. § 40-35-503(b) (1997) ("Release on parole is a privilege and not a right, . . . ."). Moreover, because the defendant is to be confined in the local jail, the trial court will retain full jurisdiction over the manner of service of his sentence. Tenn. Code Ann. § 40-35-212(c); see Tenn. R. Crim. P. 35, Committee Comment. At any time, the

defendant may apply to the trial court to serve the balance of his sentence of confinement on probation. Tenn. Code Ann. § 40-35-306(c).

Additionally, the principles of sentencing include more than the 1989 Sentencing Act's oft-cited acknowledgment that the most severe offenses should be given priority with regard to sentences of incarceration. See Tenn. Code Ann. § 40-35-102(5). The defendant, age 20, had previously been convicted of theft of property under $500 and sentenced to six months unsupervised probation. Thus, less severe measures than confinement have failed. Split confinement or "'shock probation' is of value in combining both incarceration and rehabilitation as part of a sentencing program." Tenn. Code Ann. § 40-35-306, Sentencing Commission Comments.

Finally, the defendant complains that his sentence is unfairly harsh as compared to that of Mark Gottsacker. Our law contemplates individualized sentencing. The record reflects that Gottsacker received a sentence of four years, with 120 days of confinement and the balance to be served in Community Corrections. Gottsacker pled guilty pursuant to agreement and cooperated as a witness for the state. While Gottsacker's period of confinement is shorter than that of the defendant, his sentence is one year longer. Moreover, Gottsacker's sentence is to be served consecutively to two Benton County sentences for which he had been granted probation at the time of this offense. The disparity is not unfair.

The conviction is affirmed. The judgment is modified to reflect a sentence of one year confinement in the local jail followed by two years in Community Corrections.

_____
GARY R. WADE, PRESIDING JUDGE