IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 19, 2002

## STATE OF TENNESSEE v. DONALD RICHARD HARMON, JR., and CHARLES LEONARD GOLDEN

**Appeal from the Criminal Court for Greene County**
**No. 00CR106     James E. Beckner, Judge**

**No. E2001-01506-CCA-R3-CD**
**No. E2001-01324-CCA-R3-CD**
**May 14, 2002**

The defendants, Donald Richard Harmon, Jr., and Charles Leonard Golden were convicted of theft over $1,000.00 but less than $10,000.00. See Tenn. Code Ann. §§ 39-14-103, 105(3).The trial court imposed Range I, two-year sentences for each defendant.  Each has appealed, challenging the sufficiency of the evidence and alleging as error the limitation of cross-examination of a state witness.  The defendant Harmon argues that he should have been granted an alternative sentence. The cause is remanded as to the sentencing of the defendant Harmon; otherwise, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed; Remanded for Consideration of Alternative Sentencing**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

William Louis Ricker, Greeneville, Tennessee, for the appellant, Donald Richard Harmon, Jr.

David L. Leonard, Greeneville, Tennessee, for the appellant, Charles Leonard Golden.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; and Cecil Mills, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On July 31, 2000, at about 1:00 or 2:00 P.M., the victims, David and Susan Turner, discovered that their Harley-Davidson motorcycle had been stolen from the carport of their residence in Chuckey.  The motorcycle, a 1980 Super Glide, had a fair market value of approximately $9,800.00.  David Turner noticed tire tracks across the lawn leading to the property next door which had been occupied by Laleh Liszewski, her daughter Robin, and Clarence "Willie" Williams.

Turner contacted authorities and he and Deputy Danny Greene of the Greene County Sheriff's Department found one of the motorcycle's foot pegs and a pager on the neighboring property. In the days immediately prior to the theft, Ms. Liszewski had been in the process of moving from the residence to a different neighborhood. Turner located the trailer park to which Ms. Liszewski had moved and notified the sheriff's department of her whereabouts.

Another neighbor, Mary Shelton, had noticed that Ms. Liszewski was moving from her residence in the days immediately prior to the theft. On the morning of the theft, she observed through her window a white truck in the Liszewski driveway and noticed two men attempting to load a motorcycle into the truck. When Ms. Shelton looked out her window a second time some 15 minutes later, the truck and the motorcycle were gone. Ms. Shelton identified one of the two men as Williams, the man who had lived with Ms. Liszewski. She described the other man as having long, straight, sandy brown hair which had been pulled back and gathered at the neck in a ponytail.

By the time of trial, Clarence "Willie" Williams, age 19, had entered a guilty plea to a reduced charge of Class E felony theft and received a sentence of one year. Williams, a state witness, testified that on the day prior to the theft, he had moved into a trailer park where the defendant, Richard Harmon, lived. He recalled that he and Harmon had noticed the motorcycle while they were moving out of his prior residence and, because both men were broke and needed money, they decided to steal the motorcycle. According to Williams, the two men drove around in Harmon's father's white truck all night. Williams, who described himself as drinking but "not really" drunk at the time, stated that the defendant Harmon was not drinking. He testified that they returned to the Turner residence about daybreak, discovered that the Turners were still home, and then returned after the Turners left. Williams claimed that the defendant Harmon hot-wired the motorcycle but that it wouldn't start because of a dead battery. He stated that he and Harmon pushed the motorcycle to the Liszewski residence, loaded it into the back of the truck, and left.

According to Williams, he and the defendant Harmon drove back to the trailer park and were able to start the motorcycle's engine. The defendant Harmon then led Williams, who followed in a separate car, to the residence of the defendant Golden. Williams, who parked in Golden's driveway, testified that Harmon "said [Golden] would take care of the bike for us. . . ." Williams testified that in the next two days, he waited for Golden to sell the motorcycle, returning to the Golden residence on at least five different occasions in order to determine whether it had been sold. He claimed the motorcycle was stored in the basement of a house behind the Golden residence. Williams, who first met and talked to Golden on the date of the theft, was able to describe the carport and a portion of the interior of the Golden residence. He also identified a photograph of an area near Golden's residence where the motorcycle was stored. By the time of trial, the defendant Harmon had married Ms. Liszewski. Williams was dating Harmon's former girlfriend, Nancy Riddles.

It was established by the defense that Williams had prior criminal convictions for criminal impersonation and felony evading arrest and at the time of trial, had just been released from jail after having had his probation revoked for driving under the influence, thereby violating the terms of his probation for this offense. Williams admitted being on drugs at the time of the theft.

Detective Jim Ellison interviewed the defendant Harmon about one week after the theft. Later, Detective Ellison questioned Williams and then the defendant Golden. The defendant Golden denied knowing either Harmon or Williams and claimed that he knew nothing about a motorcycle. He also stated that if anybody had brought the motorcycle to his residence, he would have known about it. The detective described Harmon at the time of the interview as having "blondish" hair, "tied behind his head with one rubber band that was sort of a bushy ponytail." Detective Ellison did not recover the motorcycle.

Josephine Ricker, who was Golden's neighbor and had known him for 30 years, testified that she had been interviewed by Detective Ellison in late August of 2000 and had informed him that she had seen a motorcycle at Golden's residence three weeks earlier. She recalled that her attention was drawn to the motorcycle when she heard a loud noise and saw two people with helmets. Ms. Ricker testified that she saw the motorcycle taken in and out of the basement of a house owned by the defendant Golden's mother. According to Ms. Ricker, Golden had lived there, but had recently moved into "the other house up there." Ms. Ricker acknowledged that she never actually saw the defendant Golden with the motorcycle.

Clarence Cogdill, who also lived near the defendant Golden, testified that he had informed Detective Ellison that he had heard a loud motorcycle, which he believed to be a Harley-Davidson, at the Golden residence near the time of the theft. Cogdill described the motorcycle driver as "a fairly young man with . . . long blond hair." Cogdill, who also testified that the house with the basement was owned by Golden's mother, saw a motorcycle parked at that house.

Michael Brown, called as a defense witness, testified that in late July or early August, he and Fred Blake drove a blue and white Harley-Davidson motorcycle, which he believed to be a Heritage, to the Golden residence. Brown claimed that Blake owned the motorcycle. Brown described his recollection of the time he visited Golden's residence as his "best guess." Blake was not called as a witness.

Sarah Druliner Burrell, Ms. Liszewski's former sister-in-law, testified that Williams had asked her brother to help him "get rid of" a Harley-Davidson motorcycle. She claimed that Williams wanted Ms. Liszewski back, to "[g]et her away from Richard," suggesting that he had a motive to lie.

Ms. Liszewski, who had married the defendant Harmon by the time of trial, also testified for the defense and acknowledged that the defendant Harmon had helped Williams move her from the residence next door to the Turners. She testified that Williams and Harmon did not "run around together . . . as far as hanging out."

I

Each defendant claims that the evidence is insufficient. The defendant Harmon argues that the verdict is based upon mere speculation. The defendant Golden argues that there was no evidence

that he participated in the theft and nothing other than the testimony of Williams, who had a prior record, which placed the motorcycle in his presence.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This court may neither reweigh nor reevaluate the evidence; nor may this court substitute its inferences for those drawn by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). The evidence is sufficient when a rational trier of fact could conclude that the defendant is guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The defendant has the burden of demonstrating that the evidence is not sufficient when there is a challenge to the sufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice. An accomplice has traditionally been defined as one who knowingly, voluntarily, and with common intent with the principal offender, joins in the commission of a crime. Clapp v. State, 94 Tenn. 186, 30 S.W. 214, 216 (1895). Only slight circumstances are sufficient corroboration. Those circumstances must, however, be entirely independent of the accomplice's testimony and lead to an inference that not only has a crime been committed but also that the defendant is implicated in that crime. Garton v. State, 206 Tenn. 79, 332 S.W.2d 169, 175 (1960). Whether a witness's testimony has been sufficiently corroborated is a function entrusted to the jury as the trier of fact. Sherrill v. State, 204 Tenn. 427, 434, 321 S.W.2d 811 (1959); Stanley v. State, 189 Tenn. 110, 222 S.W.2d 384, 386 (1949).

As to the defendant Harmon, the evidence established that he fully participated in the crime with Williams. The testimony of Mary Shelton and Clarence Cogdill, each of whom described one of the individuals involved as having sandy hair tied in a ponytail, was corroborative of Williams's testimony. The verdict, in our view, was based upon more than mere speculation.

The defendant Golden submits that the state failed to establish that he either possessed the motorcycle or had any awareness that it was stolen. Williams testified that he and Harmon took the bike to Golden's residence to be sold. It was stored in the basement of a residence, owned by his mother, that he formerly occupied. It was only a short distance from Golden's residence, a portion of which Williams described. The applicable statute provides as follows:

> A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent.

Tenn. Code Ann. § 39-14-103. The offense qualifies as a Class D felony if the value of the property is $1,000.00 or more but less than $10,000.00. Tenn. Code Ann. § 39-14-105(3).

Williams testified that the motorcycle was left in the defendant Golden's exclusive possession. He claimed that the defendant Harmon had made arrangements with Golden for the motorcycle to be sold. During the two days following the theft, Williams checked back several times to determine whether it had been sold. When questioned, the defendant Golden denied any knowledge of a motorcycle and contended that he was not acquainted with either Williams or Harmon. Neighbors placed a motorcycle at Golden's residence immediately after the Turner theft. One of the two neighbors recalled that it was a Harley-Davidson and provided a description consistent with Harmon's appearance. According to the neighbors, the motorcycle was stored in a place over which Golden had control. Possession or control over the premises may allow an inference of possession of any contraband thereon. See Armstrong v. State, 548 S.W.2d 334, 336 (Tenn. Crim. App. 1976). Unsatisfactorily explained possession of recently stolen property may, in the light of surrounding circumstances, allow an inference of criminal intent. See State v. Hatchett, 560 S.W.2d 627, 629 (Tenn. 1978); State v. Hamilton, 628 S.W.2d 742, 746 (Tenn. Crim. App. 1981). Further, it is within the province of the jury to accept or reject any explanation of the possession or control of the property stolen. See Braziel v. State, 529 S.W.2d 501, 505 (Tenn. Crim. App. 1975).

II

Next, the defendants argue that the trial court erred by limiting the cross-examination of Williams. Williams, who had been charged with a Class D felony and faced a sentence of two to four years, pled guilty to a Class E felony and received a one-year sentence. Without citing any authority, the defendant Golden submits that a full examination regarding the plea was necessary in order to expose fully Williams's motivation to lie. The defendant Harmon has incorporated the claim by reference.

During cross-examination of Williams, the following exchange took place:

Q. . . . Now, you told me a second ago that you were charged with theft over a thousand dollars, and you understood that to be a [C]lass D felony?
A. Yes, sir.
Q. Correct?
A. Yes, sir.
Q. Did your attorney advise you what the possible punishment was for that?
A. No, sir.
Q. He didn't tell you?
A. No, sir.
Q. So you didn't have any idea that you were looking at two to four years?
A. No, sir.
Q. On that charge?

At this point, an objection by the state was sustained. At a bench conference, the court instructed defense counsel that he could not elicit an answer about the specific punishment but allowed defense counsel to "use terms like . . . spend substantial time in prison or jail or something like that." After the conference was completed, the following question and answer were made a part of the record.

> Q.     You would agree with me that the plea agreement that you entered, one year at thirty percent, was house arrest?
> A.     Yes, sir.

Denial of the right to effectively cross-examine is "'constitutional error of the first magnitude'" and amounts to the denial of a basic right essential to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). While the right is fundamental, propriety, scope, and control of cross-examination is left to the sound discretion of the trial judge. Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts cannot interfere with the exercise of that discretion absent a clear and plain abuse. See State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460, 464 (1963); Coffee v. State, 181 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948).

After a review of the record of Williams's cross-examination, it is apparent that the defense was able to elicit the very information at issue. The evidence established that Williams was charged with a Class D felony and faced two to four years in prison and that he received a reduced charge, a Class E felony with a one-year sentence, in exchange for his plea of guilty and his consent to testify in this trial. The jury was fully aware of Williams's prior criminal record, including the fact that he had violated probation and served time in jail as a result.

In State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), our supreme court ruled that an accomplice may testify even if the testimony is obtained through a plea agreement. It also ruled that any promise of leniency was material to the credibility of the witness. Id. at 590. Safeguards identified before admitting testimony procured through a plea agreement are described as follows:

> (1)    full disclosure of the terms of the agreement;
> (2)    the opportunity for full cross-examination of the nature and effect of the agreement on the testimony of the witness; and
> (3)    instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of witnesses who have entered plea agreements with the state to testify against another.

Id. The content of the cross-examination of the witness suggests that defense counsel was fully aware of the nature of the agreement and had the opportunity for a full and complete cross-examination, thus meeting the Bolden requirements.

In summary, the issue has been waived for the failure to cite authority. Tenn. Ct. Crim. App. R. 10(b); State v. Dickerson, 885 S.W.2d 90, 93 (Tenn. Crim. App. 1993). Moreover, because defense counsel conducted a full and complete cross-examination of Williams, including the fact that he received a reduced charge in exchange for his guilty plea and willingness to testify, there was no error. The defendant, in our view, ultimately received an answer to the question objected to by the state.

III

The defendant Harmon argues that he should have been granted an alternative sentence. In particular, he argues that he should have been granted probation or placement into a community corrections program.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

Especially mitigated or standard offenders convicted of Class C, D, or E felonies are, of course, presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, none

of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(b).

Among the factors applicable to probation consideration are the circumstances of the offense, the defendant's criminal record, social history and present condition, and the deterrent effect upon and best interest of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978). The nature and circumstances of the offenses may often be so egregious as to preclude the grant of probation. See State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981). A lack of candor may also militate against a grant of probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983).

The purpose of the Community Corrections Act of 1985 was to provide an alternative means of punishment for "selected, nonviolent felony offenders in front-end community based alternatives to incarceration." Tenn. Code Ann. § 40-36-103. The community corrections sentence provides a desired degree of flexibility that may be both beneficial to the defendant yet serve legitimate societal aims. State v. Griffith, 787 S.W.2d 340, 342 (Tenn. 1990). Even in cases where the defendant meets the minimum requirements of the Community Corrections Act of 1985, the defendant is not necessarily entitled to be sentenced under the Act as a matter of law or right. State v. Taylor, 744 S.W.2d 919 (Tenn. Crim. App. 1987). The following offenders are eligible for community corrections:

> (1) Persons who, without this option, would be incarcerated in a correctional institution;
> (2) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
> (3) Persons who are convicted of nonviolent felony offenses;
> (4) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
> (5) Persons who do not demonstrate a present or past pattern of behavior indicating violence;
> (6) Persons who do not demonstrate a pattern of committing violent offenses; and
> Persons who are sentenced to incarceration or on escape at the time of consideration will not be eligible.

Tenn. Code Ann. § 40-36-106(a).

Moreover, in Ashby, our supreme court encouraged the grant of considerable discretionary authority to our trial courts in matters such as these. 823 S.W.2d at 171; see also State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986). "[E]ach case must be bottomed upon its own facts." Taylor, 744 S.W.2d at 922. "It is not the policy or purpose of this court to place trial judges in a judicial straight-jacket in this or any other area, and we are always reluctant to interfere with their traditional discretionary powers." Ashby, 823 S.W.2d at 171.

The defendant Harmon, 24 years of age, had a prior conviction for leaving the scene of an accident. He had driving and truancy offenses as a juvenile. Having completed the eleventh grade, the defendant Harmon was married and employed by Davis Trucking at the time of sentencing.

After determining that the defendant Harmon had a relatively minor prior criminal history, the trial court observed that he was a leader in the commission of the offense and that a two-year sentence was appropriate. After reviewing several of the considerations involving confinement and release into the community, the trial court observed that while on bail for this offense, the defendant had been charged with 10 counts of shoplifting in Washington County, with regard to which he maintained his innocence and for which defense counsel predicted dismissals. Ultimately, the trial judge, without "commenting on whether [Harmon was] guilty . . . or not," ordered confinement, concluding that Harmon had substantial involvement in the crime which involved two other offenders and that confinement was a means of avoiding inequality in sentencing.

As indicated, a Class D felony offender is presumed, under our law, to be a favorable candidate for alternative sentencing "in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Probation must be automatically considered when the sentence is eight years or less. Tenn. Code Ann. § 40-35-303(b).

Although the state argues against probation, due to the circumstances of the offense, that does not alter the presumptive favorability. While the trial court made a reference to deterrence, it did not, as the state suggests, deny an alternative sentence based upon deterrence. In State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000), our supreme court observed that "because some aspect of deterrence is present in every case, a blanket policy allowing incarceration based solely upon deterrence could do significant harm to the[] purposes [of the 1989 Criminal Sentencing Reform Act], if not eliminate them altogether." Our supreme court ruled that the record must contain proof of a need for deterrence but also held that the proof need not be "so overwhelming as to effectively remove deterrence as a consideration." Id. This record, however, does not meet the criteria for deterrence because it does not reflect the following:

(1)    The need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole; and
(2)    incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

Id. at 10.

Certainly, the trial court did not consider the specific factors applicable when deciding whether deterrence was present in this case and whether the defendant Harmon's incarceration was particularly suited to achieve that goal. See id. at 10-12.[1]

---

[1]The factors set out in Hooper are as follows:

(continued...)

An alternative sentence is any sentence that does not involve total confinement.  <u>See</u> <u>State v. Fields</u>, 40 S.W.3d 435 (Tenn. 2001).  The trial court applied Tennessee Code Annotated section 40-35-103 in denying the alternative sentence, determining that confinement was necessary to avoid depreciating the seriousness of the offense.  <u>See</u> Tenn. Code Ann. § 40-35-103(1)(B).  In <u>State v. Hartley</u>, 818 S.W.2d 370 (Tenn. Crim. App. 1991), this court deemed that an alternative sentence should be denied based upon the circumstances of the offense only when the nature of the offense is so egregious that it outweighs any favorable factors.  The trial court here also made reference to the avoidance of inequalities in sentences, perhaps comparing the sentences imposed upon Williams and the defendant Golden.  <u>See</u> Tenn. Code Ann. § 40-35-103(3).

While the trial court considered all of the applicable sentencing principles and is entitled to a presumption of correctness, it is our view that the nature and circumstances of the offense, although serious, are not so excessive or exaggerated as to outweigh other factors favoring probation.  The defendant Harmon's prior criminal history, as observed by the trial judge, was minimal.  If, in fact, the shoplifting charges have been dismissed as predicted by defense counsel, an alternative sentence is warranted.  The case is remanded to the trial court for the imposition of an alternative sentence.  The trial court may, however, take into account any evidence of shoplifting while the defendant was on bail or any convictions that may have resulted from those charges.  If the state is able to produce that evidence, the trial court may consider denial of an alternative sentence.

The judgments of conviction are affirmed as to both defendants.  The cause is remanded as to the defendant Harmon for the imposition of an alternative sentence, if appropriate.

_____
GARY R. WADE, PRESIDING JUDGE

---

[1](...continued)

(1)      whether other instances of the charged offense are increasingly present in the community, jurisdiction, or the state as a whole;

(2)      whether the defendant's crime was a result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire for profit or gain from the criminal behavior;

(3)      whether defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4)      whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving a criminal enterprise;

(5)      whether the defendant has previously engaged in criminal conduct as the same type of the offense in question, irrespective of whether such conduct resulted in a previous arrests or convictions.

<u>Hooper</u>, 29 S.W.3d at 10-12.