IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2007

**KEVIN WILKINS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-25953    John P. Colton, Jr., Judge**

---

**No. W2006-00639-CCA-R3-PC  - Filed April 18, 2008**

---

The petitioner, Kevin Wilkins, filed in the Shelby County Criminal Court a petition for post-conviction relief, challenging trial counsel's failure to appeal the petitioner's conviction for especially aggravated kidnapping. The post-conviction court granted the petitioner post-conviction relief, and the State appeals. Upon our review of the record and the parties' briefs, we reverse the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dennis Johnson, Assistant District Attorney General, for the appellant, State of Tennessee.

John H. Parker, II, Memphis, Tennessee, for the appellee, Kevin Wilkins.

**OPINION**

**I.  Factual Background**

A.  Procedural History

The instant case began after the petitioner was convicted by a jury of first degree murder and especially aggravated kidnapping. On direct appeal, the petitioner's trial counsel raised the issue of the sufficiency of the evidence supporting the conviction for first degree murder. However, counsel did not raise the issue of the sufficiency of the evidence supporting the especially aggravated kidnapping conviction. This court reversed the first degree murder conviction and stated that "[w]hile this evidence supports the especially aggravated kidnapping conviction, it does not establish beyond a reasonable doubt that the [petitioner] committed first degree murder." State v. Kevin

<u>Wilkins</u>, No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156, at *7 (Tenn. Crim. App. at Jackson, Aug. 18, 2000).

Subsequently, the petitioner filed a petition for post-conviction relief, alleging numerous claims of ineffective assistance of counsel. Specifically, the petitioner alleged that counsel (1) did not investigate the case or interview witnesses, (2) failed to meet with the petitioner, (3) failed to put on any defense proof, (4) failed to file effective pretrial motions, and (5) failed to appeal any issues relating to his especially aggravated kidnapping conviction. Following a hearing, the post-conviction court granted relief based on counsel's failure to raise any issues regarding the especially aggravated kidnapping conviction.

The State instigated the instant appeal, contending that because this court concluded on direct appeal that the evidence was sufficient to support the petitioner's conviction for especially aggravated kidnapping, the post-conviction court erred in finding that the petitioner was prejudiced by counsel's failure to challenge the especially aggravated kidnapping conviction on appeal. The petitioner contends that as a result of counsel's failure, discrepancies between the law and the facts presented against the petitioner at trial were not provided to this court on appeal.[1] The petitioner argues that he was prejudiced as a result of this failure when this court stated that the evidence was sufficient to support his especially aggravated kidnapping conviction. The petitioner also argues that this court's statement regarding the especially aggravated kidnapping conviction was dicta because the issue was not before this court; thus, the statement is not binding on this appeal.

## B. Trial

As we earlier stated, the petitioner was convicted by a jury of first degree murder and especially aggravated kidnapping. Following a direct appeal, this court summarized the proof adduced at trial as follows:

> The evidence at trial established that sometime in the morning hours of April 30, 1997, an altercation occurred between two young children, who were two or three years old. This altercation led to an altercation between the mothers of the two children, which in turn led to an altercation between the boyfriends of the mothers of the children. The boyfriends of the mothers of the children were members of two rival gangs, the Vice-Lords and the Gangster Disciples. The altercation escalated into a shooting in which the uncle of the girlfriend of a Vice-Lord shot a Gangster Disciples member's hand. When the police arrived, the altercation was quelled. This all occurred in the Hurt Village Apartment area in a section of North Memphis in Shelby County, Tennessee.

---

[1] The petitioner also filed a notice of appeal because of confusion surrounding what relief the post-conviction court granted.

Later that evening, a city-wide meeting of the Gangster Disciples took place at the Hurt Village apartment of a girlfriend of a member of the Gangster Disciples. About twenty to thirty members of the Gangster Disciples were in attendance. Three of the members who were there that evening testified for the State.

Christopher James testified that he was a member of the Gangster Disciples on April 30, 1997 and that he was present in the apartment when the meeting took place. He said that another member, called "Prentice," whom Mr. James described as a "coordinator" of the Hurt Village area gang members, came into the apartment and said that Vernon Green, the victim in this case, was "outside peeping around the corner watching at the apartment, looking out for the [V]ice-[L]ords." Mr. James said that he had known Vernon Green for seven years, that Vernon Green was "a friendly guy around the neighborhood," and that he had never known Vernon Green to be a member of any gang. Another member of the Gangster Disciples, "Greg," told some other members "to go snatch [Vernon Green] up" and bring him into the apartment. Four members left the apartment and returned with Vernon Green.

Mr. James testified that once Vernon Green was brought into the apartment, the gang member called "Greg" pushed Mr. Green down on the couch and started hitting him. He stated that after "Greg" finished hitting Mr. Green, other gang members started hitting Mr. Green. Mr. James said that someone named "Jarvis," someone called "Big Folk," and several people he did not know were hitting Mr. Green. Mr. James testified that the person called "Big Folk" who was striking Mr. Green was the [petitioner], and he positively identified the [petitioner] as "Big Folk" in the courtroom. Although he said that he did not know "Big Folk" before the evening in question, he learned that night that the [petitioner] was called "Big Folk" and that "Big Folk" was "a high powered gangster" from the Mitchell Heights area of Shelby County.

Mr. James said that after the gang members beat Mr. Green for a period of time, two members took Mr. Green upstairs. Then, several gang members, whom Mr. James identified as "Prentice," "Jarvis," "Antonio," "Big Folk," and "Foo-Foo," went into the kitchen. When they returned, "Prentice" picked out six gang members, including the [petitioner] and the other members who had been in the kitchen. "Prentice" then told Mr. James to stand up, which he did. The six members picked by "Prentice" proceeded to

give Mr. James a "pumpkin head," which he explained was where six gang members hit a person on the head for six minutes, sixty seconds, until the person's head swells like a pumpkin. He said that he received the "pumpkin head" because he did not assist another gang member in the altercation earlier that day. He also said that the [petitioner], or "Big Folk," was the first person to hit him during the "pumpkin head."

After the gang members finished giving Mr. James a "pumpkin head," the two members who had taken Mr. Green upstairs brought him back downstairs. One member called "Pooh" put a black T-shirt over Mr. Green's face. Mr. James said that Mr. Green was scared and shaking when he came back downstairs. Mr. James testified that he saw "Jarvis" and "Antonio" take Mr. Green by the arms and lead him out the door. "Foo-Foo" went out the door behind Mr. Green, and another member went out in front of Mr. Green. When Mr. Green was taken out the door, the [petitioner] was standing by the door. The [petitioner] then left the apartment. Mr. James said that "Antonio," "Jarvis," "Gregory," "Foo-Foo," and the [petitioner] all left the apartment at the same time as Vernon Green. He did not observe anything regarding these crimes after they left the apartment with Vernon Green. Mr. James testified that he had not been charged with any crime arising out of this incident.

Another member of the Gangster Disciples, James Lee White-Caradine, testified that he was also at the apartment in Hurt Village on April 30, 1997. He admitted that he was currently incarcerated for facilitation of especially aggravated kidnapping, arising out of the same incident. He said that he knew the victim, Vernon Green, as a "dude around the neighborhood."

Mr. White-Caradine testified that on the evening of April 30, he was in a room upstairs at the apartment in Hurt Village smoking marijuana with the females who were at the apartment. He said that he was upstairs because another gang member told him to go upstairs. At one point he tried to go downstairs because the women wanted to leave, but a person called "Jayrock" told him, "Nobody ain't going nowhere." "Jayrock" hit Mr. White-Caradine in the mouth with a gun, and Mr. White-Caradine went back upstairs. Mr. White-Caradine testified that he did not feel free to leave the upstairs room.

-4-

Mr. White-Caradine said that when he went downstairs to try to leave, he saw a person he knew as "Big Folk" standing behind "Jayrock" at the end of the staircase. "Big Folk" had a pistol and was telling people what to do. Other gang members had guns as well. Mr. White-Caradine said that he saw Vernon Green in the corner at the bottom of the staircase and that Mr. Green "was kneeling down like he was scared of some dudes." After he had gone back upstairs, Mr. White-Caradine heard noises like someone was "laying on the floor" in another room upstairs, and he heard someone say something like, "Man shut up, man, before you die here." He also heard noises "like somebody was getting beat up."

Mr. White-Caradine testified that he peeked out the door of the upstairs room at one point, and he saw Mr. Green going downstairs with other gang members. After he heard the door close downstairs, Mr. White-Caradine walked out of the room he was in and went into the room next door. He looked out the window from upstairs and saw Mr. Green walking outside with a shirt pulled up over his head and his pants down. He said that "Prentice," "Big Folk," "Red dude," and some other people were outside with Mr. Green. He then testified that Mr. Green got into a vehicle with some of the gang members, including someone called "McAnthony," whose real name is Charles Pool. He said that "Big Folk" got into a different vehicle with some other gang members and that "Big Folk's" vehicle left in a different direction from the vehicle in which Mr. Green was traveling.

Although Mr. White-Caradine testified that he knew "Big Folk" and that "Big Folk" was at the apartment, he testified that the [petitioner] was not "Big Folk." He said that he thought "Big Folk's" rank was chief of security or something of that nature. He said that he did not know the [petitioner]. He testified that the [petitioner] was not at the apartment that night and that he had never seen the [petitioner] before he saw him in the holding tank. He did say that he knew Christopher James and that Mr. James received a "pumpkin head" that evening because he did not help "Jayrock," also known as "Jarvis," fight the Vice-Lords earlier that day. He said that he helped clean up the blood that Mr. James left on the couch. He also said that "Prentice" told the people who were left in the house that "anybody that needs to discuss what happens in the house is going to be the next person, because the same people that came and gone that time is going to come back again."

-5-

A third member of the Gangster Disciples, Charles Anthony Pool, also known as "McAnthony," testified that his rank in the gang was "security" and that his job was to "[m]ake sure things are safe." He said he knew "Big Folk" and that "Big Folk's" rank was also "security." He admitted that at the time of trial he was serving time due to charges of conspiracy to commit murder in the first degree and especially aggravated kidnapping, arising from the incident on April 30, 1997.

Mr. Pool testified that Jarvis Shipp called a meeting of the Gangster Disciples at the apartment in Hurt Village because of the altercation that had happened earlier in the day. The gang members came to the meeting from different areas of the city. Mr. Pool said that he knew the victim, Vernon Green, and that Vernon Green was in the apartment that evening. He testified that Jarvis Shipp and some other members went out and brought Mr. Green back to the apartment against his will. When Mr. Green was brought into the apartment, Mr. Pool was in the kitchen talking on the telephone. Mr. Pool stated that Mr. Green was beaten by the gang members after he was brought into the apartment, but Mr. Pool could not remember which gang members did the beating. He did say that the same members who beat Mr. Green then beat Mr. James for something that Mr. James had done earlier.

Mr. Pool stated that he was at the apartment for about an hour, and then he left. When he left, he left with Vernon Green, Jarvis Shipp, and some other members. He got into the back seat of a car with Vernon Green and Jarvis Shipp. He said that Mr. Green was in the middle. Mr. Pool stated that he did not know the person who was driving the car. That car, along with another car, drove to Bellevue Park. Mr. Pool testified that Charlie Golden, "Big Folk," and two persons he did not know were in the other car, and "Big Folk" was driving that car. He said that "Big Folk" arrived at the park first, and the car he was in pulled up behind "Big Folk." One of the members from "Big Folk's" car got some guns out of the trunk of "Big Folk's" car. Mr. Pool said he saw a shotgun and two hand pistols removed from the trunk. He said that when Vernon Green was taken out of the car, he was "begging for his life."

Mr. Pool testified that he was told "to go get on security." The cars were parked at the bottom of a hill, and the other gang members took Vernon Green up the hill while Mr. Pool remained at the bottom of the hill on "security." Mr. Pool said that everyone "was

packing guns." He said that "Big Folk," Charlie Golden, also called "Foo-Foo," and the other members were up on the hill with Vernon Green. "Big Folk" was standing "up above" Mr. Green on the hill. Mr. Pool heard Mr. Green getting shot. He stated that he heard two or three shots.

Vernon Green was found dead the next morning in Bellevue Park. He was found with his pants pulled down and his shirt pulled up over his shoulders. He had been shot in the buttocks, in the back, and in the head.

Although Mr. Pool testified about various things that "Big Folk" did that evening, he also insisted that the [petitioner] was not "Big Folk." He said that he had seen the [petitioner] "driving around" before, but he did not know the [petitioner], and the [petitioner] was not in the apartment or on the hill that night. When the State attempted to question Mr. Pool about whether the [petitioner] was "Big Folk," Mr. Pool responded, "the one that y'all saying is Big Folk, it doesn't look like him. Like I was telling you over there, he's too little to be him. That guy right there. I don't know him. He's too little to be Big Folk."

Wilkins, No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156, at **1-5.

On direct appeal, the petitioner challenged the sufficiency of the evidence supporting the first degree murder conviction. Upon review of the evidence, this court stated:

Looking at the evidence in the light most favorable to the State, the evidence establishes that the [petitioner] participated in the detention and beating of Vernon Green and that he left the apartment at the same time as Vernon Green. The evidence then establishes that someone called "Big Folk," who was not the [petitioner], participated in the murder of Vernon Green. While this evidence supports the especially aggravated kidnapping conviction, it does not establish beyond a reasonable doubt that the [petitioner] committed first degree murder.

Id. at *7. Specifically, this court noted that James, who was not an accomplice, was "the only witness tying the [petitioner] to any of the events in question on the night of April 30, 1997." Id. at *6. However, James was not present at the park and could not testify as to what transpired during the murder of the victim. Id. The only witness who had personal knowledge of the murder at the park was Pool, an accomplice whose testimony needed to be corroborated. Id. at *7. Pool testified that the petitioner was not the "Big Folk" who was at the apartment or the park. Id. Additionally,

-7-

White-Caradine stated that the petitioner was not the "Big Folk" who escorted the victim from the apartment. Id. Thus, this court determined that "there was no evidence directly establishing the [petitioner's] participation in the murder of Vernon Green." Id. Accordingly, this court reversed the petitioner's conviction for first degree murder but affirmed his conviction for especially aggravated kidnapping.

## C. Post-Conviction

At the petitioner's post-conviction hearing, the petitioner testified that he retained counsel to represent him at trial.[2] However, the petitioner said that trial counsel met with him only twice within a ten-month period; therefore, the petitioner knew very little about his case. The petitioner stated that prior to his incarceration he met with counsel three or four times. After his incarceration, the petitioner and counsel met twice. The petitioner said that he wrote a letter to the Board of Professional Responsibility, complaining that trial counsel would not meet with him.

The petitioner said that after he sent the letter, counsel stopped by the jail and gave him the "paperwork" associated with the case, including statements and transcripts. The petitioner said that he had two days to review the materials, then counsel took back the paperwork. The petitioner maintained that some of the witnesses' statements indicated that "Big Folk" had "golds" and tattoos. The petitioner testified that he had no tattoos and had only three gold teeth. He claimed that this information confirmed his claim that he could not be the "Big Folk" referred to in the statements. Additionally, the petitioner said that the paperwork included information that several people who were shown a photospread identified someone else as "Big Folk." The petitioner wanted to discuss the statements and photospread with counsel; however, the petitioner asserted that he had no opportunity to speak with counsel about how the case was to be defended. The petitioner asserted that James was the only person at trial who identified the petitioner as "Big Folk"; White-Caradine and Pool said that the petitioner was "too little" to be "Big Folk." Counsel told the petitioner that he had discovered "lots" of people who were called "Big Folk" and that there was a good chance the State would not be able to prove their case because the two witnesses said the petitioner was not "Big Folk."

The petitioner said he informed counsel that at the time of the offense, he was at home with his wife, Tanya Morgan, and his daughter. The petitioner stated that he and Morgan met with counsel; however, counsel did not call Morgan to testify at trial. The petitioner said that he did not know why Morgan was not called to testify regarding his alibi.

The petitioner testified that counsel did not hire an investigator; instead, counsel did all of the investigation himself. The petitioner and counsel talked about individuals who were at the

---

[2] On December 6, 2001, the petitioner filed a petition for post-conviction relief, which petition was dismissed as untimely. On appeal, this court ruled that the petition had been timely filed and remanded the case for an evidentiary hearing. Kevin Wilkins v. State, No. W2002-00436-CCA-R3-PC, 2002 WL 31624971, at *1 (Tenn. Crim. App. at Jackson, Nov. 14, 2002).

apartment but had not seen the petitioner there. Counsel told the petitioner that these individuals were not called to testify at trial because counsel was unable to locate them.

The petitioner said that counsel did not maintain contact with him during the pendency of the appeal. The petitioner maintained that because of the lack of communication, "I never knew what was going on [with the appeal]." The petitioner acknowledged that the result of his direct appeal, namely that his first degree murder conviction was overturned, was favorable; however, the petitioner complained that on appeal counsel did not raise any issues regarding the kidnapping conviction. The petitioner was disappointed that counsel did not pursue a reversal of the especially aggravated kidnapping conviction.

The petitioner's trial counsel testified that the petitioner was initially charged with especially aggravated kidnapping and was released on bond. He was taken into custody after being indicted on the first degree murder charge. Counsel said that before representing the petitioner, he had tried two or three murder cases, but the petitioner's case was his only capital case.

Trial counsel's first meeting with the petitioner was at counsel's office, and they had numerous meetings afterward. Counsel stated that he obtained information from the case through his own investigation and by reviewing discovery he obtained from the State. Counsel explained that he did not hire an investigator because the petitioner could not afford to hire one. Counsel said that some witnesses were difficult or impossible to locate.

The petitioner initially told counsel that he was not "Big Folk" and that he did not know anything about the offenses. Counsel said that after they reviewed the discovery, the petitioner "admit[ted] who he was. And he admitted what his part was that he had in it. . . . He was at the kidnapping, okay. He was also at – he was also out there when they – when the murder. He said he didn't participate in the murder but he was there."

Counsel stated that when he spoke with Morgan regarding the petitioner's whereabouts on the night of the murder, she said that the petitioner was with her earlier in the evening but not at the time of the offenses. Counsel said that as a result of his discussions with the petitioner and Morgan, he did not believe that their testimony would be beneficial to the defense. He was also concerned that if called to testify, they might lie about the petitioner's whereabouts at the time of the offenses, causing an ethical dilemma for counsel.

The State questioned counsel about a photospread from which someone other than the petitioner was identified as "Big Folk." Counsel noted that the other person identified as "Big Folk" was "a little skinny guy. . . . [H]e didn't look any like a Big Folk[]." Thereafter, the following colloquy occurred:

> [The State:] Okay. So in your opinion would it have been credible, would it have been any assistance to your client to put in that photospread to try and counter the state's proof in any way?

[Counsel:]  No.

[The State:]  Okay.  And why is that?

[Counsel:]  Because I mean, the thing is it would have been obvious that whoever pointed out this as Big Folk[] must have been just playing games with the police officer.  Because there's no way – if you looked at the guy you would know.  Everyone had given a description of Big Folk[].  Even the guys – even Pool[] and the other guy, and Big Folk was always a big guy.  This guy here, you look at him.  There's no way he could have been Big Folk[].  You would have known he was lying when he got on the stand.

[The State:]  Okay.  So, the description of the guy Big Folk[] was always, no matter who you talked to prior to trial, was a large, dark skinned person with gold teeth and some [tattoos]; is that correct?

[Counsel:]  That's who Big Folk[] was.

Counsel said that on appeal he "talked about the kidnapping.  The whole thing was corroborating testimony.  I mean, the whole issue in this case was whether there was corroborating testimony as to identity."  Counsel recalled that on appeal, this court found that sufficient corroborating evidence existed to support the petitioner's conviction for especially aggravated kidnapping but that there was insufficient evidence to support the murder conviction because no one could put the petitioner at the scene of the shooting.

Counsel acknowledged that "it's significant to raise [on appeal] every argument that you have."  Counsel said that in hindsight, he should probably have raised the issue of the sufficiency of the evidence on the especially aggravated kidnapping conviction.  He said, however, that he was focused on the murder charge.

After hearing the testimony, the post-conviction court granted the petitioner relief.  The court found:

> While Counsel does not have to argue every issue on appeal, a twenty-five year sentence [for the petitioner's especially aggravated kidnapping conviction] is a serious penalty and warrants being addressed.  Counsel addressed one issue on appeal, the biggest issue only, whether or not Petitioner could be linked to the murder.  All issues surrounding the Especially Aggravated Kidnapping conviction were ignored.  Not raising a single available issue in connection with a twenty-five year sentence is a serious error.  Although the Court of [Criminal] Appeals reviewed the record and affirmed the Kidnapping

-10-

conviction, Counsel failed to point out any of the possible discrepancies in the conviction. The Court finds this deficient performance by counsel resulting in prejudice.

On appeal, the State challenges the post-conviction court's grant of post-conviction relief.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id. "To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

In the instant case, the post-conviction court stated that it "reluctantly" found that the petitioner had proven that his counsel was ineffective. The court stated that "[c]ounsel addressed one issue on appeal, the biggest issue only, whether or not Petitioner could be linked to the murder. All issues surrounding the Especially Aggravated Kidnapping conviction were ignored. Not raising a single available issue in connection with a twenty-five year sentence is a serious error." Given the proof at trial, particularly the conflicting identifications of "Big Folk," we agree with the post-conviction court that counsel's failure to raise the sufficiency of the evidence supporting the especially aggravated kidnapping conviction was deficient. However, we must examine the sufficiency of the evidence of the especially aggravated kidnapping conviction to determine whether the petitioner suffered prejudice as a result of counsel's deficiency.

-11-

We note that the petitioner's especially aggravated kidnapping conviction was based upon the petitioner's false imprisonment of the victim accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-305(a)(1) (1997). On direct appeal, this court stated that there was sufficient evidence to support the petitioner's conviction for especially aggravated kidnapping. Wilkins, No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156, at *7. The petitioner claims that this court's previous statement is dicta and should not be considered binding. We note that

> [c]ourts sometimes go beyond the point necessary for a decision in a lawsuit and make expressions on certain things there involved which are not necessary for a determination of the lawsuit. Such statements by a court are known as dictum. The term 'dictum' is an abbreviation of 'obiter dictum' which means generally a remark or opinion uttered by the way. Obviously the very definition of the term shows that it has no bearing on the direct route or decision of the case but is made aside or on the way and is, therefore, not a controlling statement to courts when the question rises again that has been commented on by way of dictum. Frequently and naturally dictum is persuasive, but, as a general rule it is not binding as an authority or a precedent within the rule of stare decisis.

Staten v. State, 232 S.W.2d 18, 19 (Tenn. 1950); see also Black's Law Dictionary 465, 1100 (7th ed. 1999). As we have noted, on direct appeal the petitioner challenged only the sufficiency of the evidence of the first degree murder conviction. The sufficiency of the evidence to support the especially aggravated kidnapping conviction was not before this court and appears to be a remark "made aside or on the way." Thus, we conclude that the statement that the evidence was sufficient to support the especially aggravated kidnapping conviction was dictum.

Our review of the record reveals that the petitioner was positively identified by James, who was not an accomplice, as the "Big Folk" who was present at the apartment during the victim's detention. The proof at trial clearly reflected that the victim was brought to the apartment and detained against his will. White-Caradine testified that "Big Folk" stood by the front door of the apartment, armed with a "big ole pistol. . . . He was telling them what to do." Additionally, James, Pool, and White-Caradine testified that "Big Folk" participated in beating the victim while he was at the apartment.

On direct appeal, this court noted that the only witness who had personal knowledge of the murder was Pool, an accomplice whose testimony needed to be corroborated. Wilkins, No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156, at *7. Therefore, this court concluded that there was insufficient evidence to support the petitioner's first degree murder conviction. Id. We note that generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[]." State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994). However, this court specifically noted on direct appeal that James was not an accomplice; thus, his testimony did not need corroboration. See Prince v. State, 529 S.W.2d 729, 732 (Tenn. Crim. App. 1975). Further,

-12-

the proof at trial indicates that White-Caradine was not an accomplice as a matter of law; therefore, his testimony did not necessarily need corroboration. See State v, Robinson, 239 S.W.3d 211, 226 (Tenn. Crim. App. 2006).

After our review of the record, we conclude that there was proof to support that the petitioner was the "Big Folk" at the apartment. Specifically, the testimonies of James, White-Caradine, and Pool, while not identical in minute detail, are so similar that it is clear that all three witnesses were testifying about the same "Big Folk" engaging in the same behavior at the apartment. In fact, the only substantial divergence in the witnesses' testimony is the identification of the petitioner as "Big Folk." We note that "corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration." State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). Moreover, it is not necessary that an accomplice's testimony be corroborated in every detail; corroboration may be slight as long as it relates to some fact that "tend[s] to connect the defendant with the commission of the crime." Clapp v. State, 30 S.W. 214, 217 (Tenn. 1895). In the instant case, the jury heard the testimony of all three witnesses and, obviously, as was their prerogative, accredited the testimony of James regarding the petitioner's identity as "Big Folk." See State v. Bolin, 922 S.W.2d 870, 875 (Tenn. 1996) (noting that a "jury is free to believe only part of a witness' testimony"); State v. Adams, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000) (stating that a jury is free to accept portions of a witness' testimony while rejecting others). Thus, when viewed in toto, we conclude that the testimony of all three witnesses was sufficient to sustain the petitioner's conviction for the especially aggravated kidnapping committed by "Big Folk" in the apartment. Therefore, while counsel's failure to raise on direct appeal any issues regarding the especially aggravated kidnapping conviction may have been deficient, the petitioner has failed to prove any prejudice related to the alleged deficiency. Accordingly, the petitioner has not met his burden of establishing that counsel was ineffective. Thus, the post-conviction court erred by granting the petitioner post-conviction relief.

### III. Conclusion

Based upon the foregoing, we reverse the post-conviction court's grant of post-conviction relief.

_____
NORMA McGEE OGLE, JUDGE

-13-