IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 27, 2021 Session

**STATE OF TENNESSEE v. ERIC BOYD**

**Appeal from the Criminal Court for Knox County**
**No. 112657   Bobby R. McGee, Judge**

_____

**No. E2019-02272-CCA-R3-CD**

_____

Defendant, Eric Boyd, was convicted of two counts of first degree felony murder, two counts of aggravated robbery, two counts of especially aggravated kidnapping, and four counts of aggravated rape. For his convictions, Defendant received an effective sentence of two consecutive life sentences for the felony murder convictions and an additional 90 years for the remaining convictions. Defendant appeals his convictions, asserting that: 1) the trial court erred by denying Defendant's motion for a change of venue, or in the alternative, a special jury venire; 2) the trial court erred by allowing the State to introduce transcripts of a witness's testimony from a federal court proceeding as substantive evidence against Defendant; 3) the evidence was insufficient to support Defendant's convictions; and 4) he is entitled to relief under the cumulative error doctrine. After a thorough review of the record, we determine no error. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr. (on appeal), Knoxville, Tennessee; and Clinton Frazier (at trial), Maryville, Tennessee, for the appellant, Eric Boyd.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phil Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

***Evidence Presented at Trial***

This case arises from the January 2007 carjacking, robbery, kidnapping, rape, and murder of Channon Christian and Christopher Newsom in Knoxville, Tennessee.[1] On Saturday, January 6, 2007, Ms. Christian and Mr. Newsom planned to have dinner together and then attend a party at a friend's house, but they never arrived.

On Saturday afternoon, Ms. Christian drove to her friend Kara Sowards' apartment at the Washington Ridge Apartments to get ready for the party. Ms. Sowards left to go to the party at around 8:00 p.m. At around 9:00 p.m., Mr. Newsom dropped off his friend Josh Anderson at the party and told friends that he and Ms. Christian would arrive later. At around 10:00 p.m., their friends called and texted them but received no reply. At around 11:00 p.m., Mr. Anderson went to the Washington Ridge apartment complex and discovered Mr. Newsom's truck in the parking lot, but Ms. Christian's Toyota 4Runner was missing.

At around 12:30 a.m. on Sunday, January 7, 2007, Xavier Jenkins, an employee for Waste Connections, saw Ms. Christian's 4Runner parked in front of a house at 2316 Chipman Street, which was Lemaricus Davidson's house. He saw a white car parked directly behind the 4Runner. He observed that the porch light was on at the house, and the house appeared "kind of busy." At around 1:00 a.m., Mr. Jenkins saw the 4Runner pull away from where it had been parked in front of the Chipman Street house. As the vehicle drove past where Mr. Xavier was parked, it slowed down, and he saw four African-American men inside. He testified that the driver "mean-mugged" him, and it made him uncomfortable enough to call his father to tell him what happened. When Mr. Jenkins returned from his work route at around 6:30 a.m., he saw Ms. Christian's 4Runner parked on Chipman Street facing the railroad tracks.

On Sunday at 12:33 a.m., Ms. Christian called her father and told him that she would be home between 2:00 and 3:00 a.m. Cell phone records indicate that the call came from the Cherry Street area in the general vicinity of Davidson's house. At 1:45 a.m., Jerome Arnold was watching television at his residence one block from Davidson's house when he heard "three pops" coming from the direction of the railroad tracks. At 7:45 a.m., Roy

---

[1] Defendant is the fifth person to be charged and convicted for the crimes against the victims in this case. *See State v. Davidson*, 509 S.W.3d 156 (Tenn. 2016); *Lemaricus Davidson v. State*, No. E2019-00541-CCA-R3-PD, 2021 WL 3672797 (Tenn. Crim. App. Aug. 19, 2021); *State v. George Geovonni Thomas*, No. E2013-01738-CCA-R3-CD, 2015 WL 513583 (Tenn. Crim. App. Feb. 5, 2015), *perm. app. denied* (Tenn. Aug. 12, 2015); *State v. Vanessa Coleman*, No. E2013-01208-CCA-R3-CD, 2014 WL 6908409 (Tenn. Crim. App. Dec. 9, 2014), *perm. app. denied* (Tenn. May 14, 2015); *State v. Letalvis Darnell Cobbins*, No. E2013-00476-CCA-R3-CD, 2014 WL 4536564 (Tenn. Crim. App. Sept. 12, 2014), *no perm. app. filed*. Defendant was previously tried and convicted in the United States District Court for the Eastern District of Tennessee for being an accessory after the fact and misprision of a felony. *U.S. v. Eric Dewayne Boyd*, 640 F.3d 657 (6th Cir. 2011).

Thurman arrived at R.T. Coating, his place of employment, and saw smoke rising from the railroad tracks. On Sunday, at around 12:20 p.m., J.D. Ford, a Norfolk Southern Railroad employee, discovered Mr. Newsom's severely burned body beside the railroad tracks near Davidson's house. Mr. Newsom had been shot, his hands and feet bound, his eyes blindfolded, and his head was wrapped in a sweatshirt. He was not wearing pants or shoes.

On Sunday night, friends and family of the victims searched the Cherry Street area for Ms. Christian's vehicle. They discovered the vehicle at the corner of Chipman and Glider Streets. An orange University of Tennessee "Power T" decal and a "NorthFace" sticker had been removed from the back window, and two "Power T" decals had been removed from the side windows. Sandra Kileen Bible, who lived in the house at the corner of Chipman and Glider Streets, had not seen the vehicle there on Saturday night at midnight when she went onto her front porch.

Police responded to the location of Ms. Christian's vehicle. The driver's seat of the vehicle was pushed back and reclined, and the backseat floorboard was caked with mud. Bags of clothing that Ms. Christian had planned to donate were missing from the back of her vehicle.

On Tuesday, January 9, police executed a search warrant at Davidson's residence. After officers cleared the 805-square-foot house, Sergeant Keith DeBow found Ms. Christian's body inside a trash can in the kitchen. A search of the residence produced several items belonging to the victims, including Ms. Christian's clothing and shoes, her iPod with the inscription, "Channon Christian, Love You, Mom and Dad," her purse, paystubs from her employer, her keys, Mr. Newsom's hat, and his burned driver's license. Officers also found a blue bandana, floral printed fabric, and a bottle of bleach cleaner.

George Thomas testified that he, Letalvis Cobbins, and Vanessa Coleman went to stay at Davidson's house in early January 2007. On Thursday, January 4, Defendant drove them to a basketball game and then drove them back to Davidson's house. After they returned to the house, Davidson and his girlfriend, Daphne Sutton, got into an argument, and Sutton left the house.

Thomas testified that on Saturday, January 6, Letalvis Cobbins told him that Davidson wanted "to go steal a car." Cobbins and Davidson left the house, and they were gone "for a good little while." When they returned to the house, Cobbins told Thomas that it was "time to go." Thomas then saw Davidson lead Ms. Christian into the living room. Defendant was standing with Mr. Newsom in an enclosed sun porch just inside the front door. Both victims were blindfolded, and their wrists were bound. Thomas noticed "a white SUV" outside.

According to Thomas, Davidson took Ms. Christian into his bedroom at the front of the house, and Thomas went to the back bedroom. Thomas returned to the living room about 15 minutes later, and Davidson told him to "go with [Defendant]." Defendant led Mr. Newsom to the SUV, and Thomas followed. Defendant drove them to "an industrial building" or "some kind of warehouse" near the railroad tracks. Mr. Newsom was still blindfolded and his hands bound. He was wearing pants and a shirt, but he did not have on shoes. Defendant told Thomas "to help him with Mr. Newsom," and Thomas refused. Thomas testified that Defendant opened the back door, grabbed Mr. Newsom, and walked him toward a drainage ditch area. Thomas stayed in the front passenger seat of the vehicle. Thomas saw three flashes and then saw Defendant pulling Mr. Newsom's body behind the building. Defendant returned to the vehicle, grabbed a can of gasoline, and returned to the area where he left Mr. Newsom. Thomas testified that a couple of minutes later, he saw "a bright whoosh." Defendant then returned to the vehicle and drove back to Davidson's house.

When they arrived, Defendant told Davidson, "that's taken care of." Thomas told Cobbins that Defendant had killed Mr. Newsom. Thomas, Cobbins, and Coleman "wanted to leave," and Defendant told them to "let [them] finish doing whatever [they were] doing." Defendant left the house in his car, a white Pontiac, which Thomas testified was parked across the street. Defendant returned to Davidson's house 20 to 30 minutes later. At some point, Thomas, Cobbins, Coleman, and Davidson left in Ms. Christian's 4Runner and drove to Vince Wernimont's house, leaving Defendant alone with Ms. Christian inside Davidson's house. Thomas testified that Wernimont was not home, so they drove around and returned to Davidson's house. For the next several hours, Thomas, Cobbins, Coleman, Davidson, and Defendant sat around and smoked marijuana while Ms. Christian remained in Davidson's bedroom. Thomas saw Davidson, Cobbins, and Defendant go into the bedroom at different times. Thomas testified that he never heard Ms. Christian scream or cry.

Thomas testified that he woke up on Sunday morning, and Defendant was gone. Thomas ate breakfast with Cobbins and Coleman. Later that day, they walked to the store, and when they returned, the SUV was gone. Thomas testified that a short time later, Daphne Sutton came to the house. She and Davidson argued in the front bedroom. Sutton then walked towards the kitchen, and Davidson grabbed her and told her that she did not live there anymore. Sutton then left the house. Thomas, Cobbins, and Coleman walked to Vince Wernimont's house before spending the night at the house of someone named "Jody." On Monday morning, Jody drove Thomas, Cobbins, and Coleman to Notasha Hays's house in Kentucky.

Thomas had seen Defendant with a .22 caliber gun earlier on Saturday. On cross-examination, Thomas acknowledged that he told police in a statement he gave immediately

following his arrest that he thought Defendant had a revolver. Thomas also acknowledged that he told police in his statement that Defendant left the house with Mr. Newsom and returned alone. Thomas acknowledged that he had been given a lighter sentence in exchange for his testimony in this case.

Jody Long testified that Vince Wernimont was her drug dealer. In January 2007, Mr. Wernimont asked her to "give some friends of his a ride to Kentucky." Ms. Long drove Thomas, Cobbins, and Coleman to Kentucky in exchange for drugs. Ms. Long testified that when she returned to Knoxville, she saw a news story informing that the police were looking for the individuals she had just driven to Kentucky.

Adrienne Mathis, Defendant's cousin, testified for the State. She testified that she owned a white Pontiac Sunbird at the time of the murders. Ms. Mathis testified that the car was "always messed up" and she kept gas cans in the trunk of the car. Ms. Mathis testified that she could not recall loaning her car to Defendant in early January 2007. She did not recall giving testimony in the trials of Thomas or Coleman. When the prosecutor attempted to refresh Ms. Mathis' recollection with a transcript of her testimony, Ms. Mathis could not recall much of her testimony. Ms. Mathis agreed that she had "no desire to be [t]here" testifying at Defendant's trial. Ms. Mathis agreed that she previously testified at Defendant's federal trial, but she claimed not to remember her prior testimony. She could not recall Defendant calling her about her car on Sunday, going to Ridgebrook Apartments to get her car, or finding a clear sandwich bag containing bullets inside the car. The trial court admitted a transcript of Ms. Mathis's prior testimony from Defendant's federal trial into evidence.

Xavier Jenkins identified Adrienne Mathis's white Pontiac Sunbird in a photographic lineup as the same vehicle that he saw parked behind Ms. Christian's 4Runner outside Davidson's house in the early morning hours on Sunday, January 7. Police searched the white Pontiac Sunbird and found a gasoline container with a "very small amount of gasoline" inside in the trunk of the vehicle.

Daphne Sutton testified that she moved out of Davidson's Chipman Street house in December 2006. She took all of the furniture from the house except a kitchen table and an air mattress. Ms. Sutton recalled that Thomas, Cobbins, and Coleman were staying at Davidson's house after she moved out. Ms. Sutton testified that she and Mr. Davidson had an altercation on Thursday, and she left the residence. She testified that Coleman, Cobbins, and Thomas were the only people at the house when she left and that none of them had a vehicle. On Sunday, Davidson told Sutton that he had a bag of clothes for her but that she had to wait 30 minutes before coming over. Sutton suspected "[t]here was another female there[,]" so she immediately drove to Davidson's house. When she arrived, she saw Thomas and Cobbins in the living room. She tried to go into the bathroom to get her

makeup, and "it was locked or [Davidson] stopped [her]" and told her someone was in the bathroom. She tried to walk through the kitchen and "around through the back bedroom and get to the bathroom" and Davidson "wouldn't let" her. He "kept grabbing" her. He told her that it was no longer her house. Sutton noticed a kitchen chair in front of the air mattress in the bedroom, which was unusual. She testified that nobody was in the bedroom. Davidson gave her a bag of clothes and a ring and tried to give her money. The bag contained used clothes. Sutton kept a few items of clothing but told Davidson to get the rest of the clothes. When he arrived at her apartment to retrieve the bag of clothes, he was driving a Toyota 4Runner that had an orange Power T and a NorthFace sticker on the back window.

In the early morning hours on Monday, Davidson called Sutton and asked her to pick him up from his house on Chipman Street. He told her that the door was locked and Cobbins had the key. Sutton drove a friend's vehicle to pick up Davidson, who was waiting in Sutton's car that was parked on Chipman Street. Davidson stayed with Sutton at her friend's apartment on Monday night. On Tuesday, Sutton received a call from her mother stating that a body had been found in Davidson's house. Sutton told Davidson that he had to leave the apartment, so she and her friend drove him to Ridgebrook Apartments.

Danielle Lightfoot testified that on Tuesday, January 9, Defendant and Davidson arrived at her apartment. Defendant and Davidson stayed at the apartment Tuesday night. The following day, they were sitting around the apartment when a photograph of Davidson appeared on the news. Lightfoot told Defendant and Davidson that they had to leave, but they asked to stay until that evening. She agreed and gave Defendant a key to her apartment. Ms. Lightfoot testified that she knew Daphne Sutton and that Sutton drove a "white, small car . . . like a Sunfire."

On January 11, police located Defendant leaving his mother's apartment at Ridgebrook Apartments and initiated a traffic stop. Defendant cooperated and told police Davidson's whereabouts. Defendant told police that he and Davidson had broken into a vacant house on Reynolds Street. Defendant had left Davidson at around 5:30 a.m. and was going to return with food. Defendant rode with police to the house where Davidson was, and a SWAT team apprehended Davidson. Police found a .22 caliber Sentinel High Standard revolver and Mr. Newsom's Nike shoes inside the house.

On Thursday, January 11, Thomas, Cobbins, and Coleman were arrested at Natosha Hays's house in Lebanon, Kentucky. During a search of Hays's residence, officers found a .22 caliber Clerke revolver as well as a green striped bag, orange pouch, and other items belonging to Ms. Christian.

- 6 -

Two of the bullets recovered from Mr. Newsom's body were .22 long rifle bullets that were fired by the same gun. The bullet recovered from Mr. Newson's skull was too damaged to determine whether it was also fired from the same gun. Ballistics testing was inconclusive as to whether the bullets were fired from the Sentinel revolver that was in Davidson's possession when he was arrested.

Dr. Darinka Mileusnic-Polchan performed autopsies on Ms. Christian and Mr. Newsom's bodies. Mr. Newsom was anally penetrated one to two hours before he died. He had tearing, swelling, and bruising to his anus and rectum. He was gagged and blindfolded, his hands and feet bound, and his head was covered with a sweatshirt. Mr. Newsom was not wearing pants or shoes, and his feet were covered in mud, indicating that he walked barefoot to the area where he was killed.

Mr. Newsom was shot three times. One bullet entered Mr. Newsom's back between his neck and shoulders. Another bullet entered his lower back, traveled "steeply upward[,]" and severed his spinal cord. The fatal shot was fired with the muzzle of the gun "tightly pressed against the skull" because soot and gunpowder were embedded in the scalp, even through layers of sweatshirt material. That bullet severed his brain stem and caused instantaneous death. All three bullets remained lodged in Mr. Newsom's body. Mr. Newsom's body was then wrapped in a comforter, an accelerant poured over him, and he was set on fire. Soil samples taken from where Mr. Newsom's body was found indicated the presence of gasoline.

Ms. Christian died from asphyxiation as a result of being stuffed into a trash can with a plastic bag tied around her head. Ms. Christian was forced into a fetal position and bound with her upper body pressed against her thighs and her face pressed against her knees. She was wearing only a camisole and a sweater. She had extensive bruising and hemorrhaging to her genital area, as well as lacerations. Her frenulum, the membrane that connects the lip to the gum, was torn. These injuries were caused by "a forceful introduction of some object into the mouth." She had bruising and abrasions around her mouth. These injuries occurred while Ms. Christian was still alive. Dr. Mileusnic-Polchan estimated that Ms. Christian died "any time between Sunday evening and Monday." She testified that Ms. Christian would have died within five minutes of having the plastic bag tied around her head.

Davidson's DNA from sperm was found in Ms. Christian's vagina, anus, and on her jeans. Cobbins' DNA from sperm was found in Ms. Christian's mouth and on her camisole, sweater, and jeans. A bleach substance was found on Ms. Christian's camisole. The fabric used to bind Ms. Christian's body came from the curtains and bedding that Ethel Lynn Freeman sold to Davidson. Davidson's fingerprints were found on three of the five plastic garbage bags that contained Ms. Christian's body, and his palm print was found on

the outermost bag, consistent with him either lifting the bag with weight inside or pushing down on the bag.

Defendant's DNA was on a gun holster that was found inside Ms. Mathis's car. Defendant's DNA was not found on anything that was taken from the Chipman Street house, nor was Thomas's DNA found on anything taken from the Chipman Street house.

Defendant did not testify or present any other evidence. The jury found Defendant guilty of 16 counts of felony murder, two counts of first degree premeditated murder, two counts of the lesser-included offense of aggravated robbery, four counts of especially aggravated kidnapping, and 12 counts of aggravated rape.

The trial court approved the jury's verdict and merged Defendant's convictions into two counts of felony murder, two counts of aggravated robbery, two counts of especially aggravated kidnapping, and four counts of aggravated rape. Following a sentencing hearing, the trial court, both on the record and in a detailed sentencing order, imposed an effective sentence of two consecutive life sentences, with an additional 90 years' incarceration. Defendant did not appeal any issues relating to his just sentence.

Defendant filed a timely motion for new trial, which the trial court denied after a hearing. This appeal followed.

## *Analysis*

In this appeal as of right, Defendant contends that: 1) the trial court erred by denying his motion for a change of venue, or in the alternative, a special jury venire; 2) the trial court erred by allowing the State to introduce transcripts of Ms. Mathis's prior testimony at Defendant's federal trial as substantive evidence in the trial in this case; 3) the evidence was insufficient to support Defendant's convictions; and 4) he is entitled to relief under the cumulative error doctrine.

### *Change of Venue/Special Jury Venire*

Prior to trial, Defendant filed a motion requesting a change of venue on the grounds that Defendant would not be able to receive a fair trial due to "extensive and prejudicial pre-trial publicity" of the case. Alternatively, Defendant sought a change in jury venire. At a pretrial motions hearing, defense counsel argued that there had been an "enormous amount of pretrial publicity in this case[.]" The State argued that most of the media attention occurred in the "first few years" after the crimes occurred and there had been "very little" "recent publicity" surrounding the case.

The trial court denied Defendant's motion, finding that there were "three factors . . . of great importance in making th[e] determination." The court first noted "the age of the case[,]" finding that "there's good reason to believe that it would be much more possible to find . . . a Knox County jury at this time than it would have [been] ten years ago." The trial court also noted that Lemaricus Davidson was tried by a Knox County jury closer in time to the crimes. Additionally, the trial court found "that the publicity that did occur, by and large, didn't concern [Defendant]." Defendant "was not part of that original group of defendants who went through the trial process."

On appeal, Defendant argues that a large portion of the jury venire had heard of the victims and the perpetrators, had heard about the crimes from family or friends, had already formed opinions of guilt, and already believed Defendant was guilty. The State responds that Defendant is not entitled to relief because he has failed to show that the jury was prejudiced against him.

Whether to grant a motion for change of venue rests within the discretion of the trial court. *State v. Rogers*, 188 S.W.3d 593, 621 (Tenn. 2006). A change of venue should be granted, however, when "a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). In *Rogers*, our supreme court identified the criteria governing whether a change of venue is in order: the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire persons' familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations, or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury. *Rogers*, 188 S.W.3d at 621-22 (citing *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979)).

Further, in order to obtain relief on a claim that the trial court improperly denied a motion for a change of venue, a "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *Rogers*, 188 S.W.3d at 622 (citing *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992)). "The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue." *Rogers*, 188 S.W.3d at 621 (citing *State v. Mann*, 959 S.W.2d 503, 531-32 (Tenn. 1997)). "[P]rejudice will not be presumed

on the mere showing of extensive pretrial publicity." *Rogers*, 188 S.W.3d at 621 (citing *State v. Stapleton*, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982)); *see also State v. Thacker*, 164 S.W.3d 208, 238 (Tenn. 2005) ("One who is reasonably suspected of murder cannot expect to remain anonymous."); *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989).

An individual examined during voir dire is not required to have a complete lack of knowledge of the facts and issues to be selected as a juror. *See State v. Pike*, 978 S.W.2d 904, 924 (Tenn. 1998). As the United States Supreme Court has said, it is "sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see also Mann*, 959 S.W.2d at 531 (recognizing that jurors may be selected to hear a trial if they are able to set aside an opinion and render a verdict based on the evidence in court).

The record demonstrates that the trial court conducted a meticulous and detailed jury selection process. Each prospective juror completed a jury questionnaire. The trial court allowed Defendant and the State to conduct individual voir dire of the prospective jurors who they believed may have had problematic exposure to pretrial publicity or other information about the case. The trial court excused for cause 15 potential jurors who indicated during individual voir dire that they would have had difficulty being impartial.

The trial court then allowed Defendant and the State to conduct general voir dire of the remaining prospective jurors. The trial court granted both the State and the Defendant 12 peremptory challenges each, which included four for the alternates. The trial transcript does not indicate which party challenged a particular potential juror. It does demonstrate that a total of only eight peremptory challenges were exercised by both sides, demonstrating that Defendant did not exhaust all his peremptory challenges.

Defendant does not contend that any of the 12 jurors who served at his trial were biased or prejudiced against him by pretrial publicity. Rather, he claims that the 130 jury questionnaires show that a significant portion of the jury venire had heard of the victims, had heard of one or more of the defendants involved, had heard about the facts of the case, and had formed an opinion as to Defendant's guilt. Defendant asserts that the prospective jurors' responses to the questionnaire demonstrated "that a fair trial . . . could not be held in Knox County with a jury drawn from a Knox County venire."

The record shows that the trial court considered numerous relevant factors in determining whether to grant a change of venue. The trial court also conducted a lengthy and detailed voir dire process that was devoted to determining the nature and extent of exposure to media coverage of the defendants and victims as well as its potential effect on

the views of the potential jurors. The members of the venire who completed a questionnaire with a suggested impartiality difficulty, were excused by the trial court.

Defendant has failed to show that any of the 12 jurors or four alternate jurors selected in this case were actually prejudiced or biased against him. *See Evans*, 383 S.W.2d at 192. In fact, having reviewed the questionnaires of those 16 individuals and the transcript of the voir dire, there is no response to suggest that any of the jurors were actually prejudiced or biased against Defendant. Furthermore, Defendant did not exhaust all his peremptory challenges. *See State v. Lindsey Brooke Lowe*, No. M2014-00472-CCA-R3-CD, 2016 WL 4909455, at *32-33 (Tenn. Crim. App. July 12, 2016), *perm. app. denied* (Tenn. Jan. 18, 2017) (noting the defendant's failure to exhaust her peremptory challenges in concluding that the trial court did not err in denying a change of venue); *State v. Sexton*, 368 S.W.3d 371, 398 (Tenn. 2012) (holding that a defendant's failure to exhaust peremptory challenges precluded a challenge to the trial court's failure to excuse a juror for cause); *State v. Thacker*, 164 S.W.3d 208, 236 (Tenn. 2005) (concluding that the trial court did not abuse its discretion by considering "the defendant's failure to exhaust all peremptory challenges, the careful supervision of voir dire by the trial court, and the assertion by the jurors that they could and would give the defendant a fair and impartial trial").

We, therefore, conclude that the trial court did not abuse its discretion in denying Defendant's motion for a change of venue or denying Defendant's motion for a special venire. Defendant has not demonstrated that because of undue excitement against him that he did not receive a fair trial in Knox county with a venire from Knox county. The entire record indicates a high degree of care was exercised by the trial court in the jury selection process, which rendered Defendant a fair trial. Defendant is not entitled to relief on this issue.

*Admission of Prior Testimony*

Defendant contends that the trial court erred by admitting the prior testimony of Adrienne Mathis from the federal proceeding against Defendant as substantive evidence in this case. Defendant asserts that it lacked sufficient trustworthiness and should have been excluded under Tennessee Rule of Evidence 803(26). The State responds that the trial court properly admitted the evidence.

During a jury-out hearing, Ms. Mathis testified that she could not "remember anything" and that her testimony was "[j]ust repeating what [she had] seen on paper." She testified that she was "prepped" prior to her testimony in federal court and that her testimony was "[p]robably not" truthful. She did not recall previously testifying that she loaned her car to Defendant on the weekend of the murders. She also did not recall

Defendant calling her on a Sunday to tell her that her car was broken down in front of his mother's apartment. She did recall going to Ridgebrook Apartments and seeing her car parked in front of Defendant's mother's apartment. However, she did not recall testifying that she found a sandwich bag containing several bullets inside the car.

The trial court found that the "tenor" of Ms. Mathis's responses was that she did not deny her prior statements, but rather that she could not remember. The trial court stated, "[s]ince she's not denying, extrinsic evidence is not admissible," and the trial court ruled that the transcripts of Ms. Mathis's prior testimony were, therefore, not admissible.

At the conclusion of the State's proof, the State again argued for the admission of Ms. Mathis's prior testimony as substantive evidence under Tennessee Rule of Evidence 803(26) because it was inconsistent with her testimony that she did not recall whether she loaned her car to Defendant or that she found bullets in the car. The State asserted that Ms. Mathis was subject to cross-examination, that her prior testimony was given under oath, and that her prior testimony was trustworthy because it was consistent with her testimony at the trials of the other defendants involved in the offenses.

The trial court found that Ms. Mathis testified at Defendant's federal trial; that the prior testimony was a written statement; that Ms. Mathis was under oath; and that she was "cooperating and giving lucid answers" when she testified at the prior trial. The court found that Ms. Mathis's prior statements were made under circumstances indicating trustworthiness. The trial court allowed the State to introduce a transcript of Ms. Mathis's prior testimony as substantive evidence.

Generally, this Court reviews a trial court's decisions regarding the admissibility of evidence for an abuse of discretion. *See State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

The parties acknowledge that the prior testimony was hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay generally is not admissible. Tenn. R. Evid. 802. Our rules of evidence provide for the admission of hearsay statements, however, pursuant to the exceptions set forth in Rules 803 and 804.

The trial court admitted the testimony as substantive evidence under Rule 803(26) of the Tennessee Rules of Evidence, which provides for the admission of a testifying witness' prior inconsistent statement "otherwise admissible under Rule 613(b)" as substantive evidence if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Additionally, the 2009 Advisory Commission Comment to this provision provides as follows:

Subsection (26) alters Tennessee law by permitting some prior inconsistent statements to be treated as substantive evidence. Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example. This rule incorporates several safeguards to assure that the prior inconsistent statements are both reliable and authentic.

To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.

Tenn. R. Evid. 803(26) Advisory Comm'n Cmts.

Defendant contends that Ms. Mathis's prior testimony "does not rise to the level of trustworthiness" required for admissibility under Rule 803(26) because she testified during the jury-out hearing that her prior testimony was "[j]ust repeating what [she had] seen on

paper," that she was "prepped" prior to her testimony in federal court, and that her testimony was "[p]robably not" truthful. In his brief, Defendant concludes that "Mathis stated that her prior testimony was false and did not accurately reflect her direct personal knowledge of the events that she testified about." We disagree.

Our supreme court has held that "for the purposes of Tennessee Rule of Evidence 803(26), a prior statement about events that a witness claims at trial to be unable to remember is 'inconsistent' with the witness's trial testimony." *State v. Davis*, 466 S.W.3d 49 (Tenn. 2015).

At trial, Ms. Mathis was afforded the opportunity to explain or deny her prior statements, satisfying Rule 613. She was also subjected to cross-examination. The trial court held a jury-out hearing and ultimately determined that the prior statements were made under circumstances indicating trustworthiness. All of the conditions of Rule 803(26) were met. We conclude that the trial court did not err in admitting the prior testimony as substantive evidence. Defendant is not entitled to relief on this issue.

### Sufficiency of the Evidence

Defendant contends that the trial court erred by affirming the jury's verdicts. He argues that the evidence at trial was insufficient to support his convictions "because the convictions were based on the uncorroborated testimony of an accomplice witness" and because the State failed to prove that Defendant "possessed the requisite intent for conviction, either directly or circumstantially, or otherwise met the statutory requirements necessary to sustain a conviction based on criminal responsibility." The State argues that the proof was more than sufficient to support Defendant's convictions.

Our standard for reviewing the sufficiency of the evidence, both direct and circumstantial, is limited. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). We must afford the State "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007) (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). The determinative question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Although we review de novo the application of the law to the facts, *Jordan v. Knox Cnty.*, 213 S.W.3d 751, 763 (Tenn. 2007) (citing *State v. Thacker*, 164 S.W.3d

208, 247-48 (Tenn. 2005)), we cannot substitute our own inferences for those drawn by the factfinders at trial, *State v. Lewter*, 313 S.W.3d 745, 747-48 (Tenn. 2010).

Defendant was convicted of first degree felony murder, aggravated robbery, especially aggravated kidnapping, and aggravated rape. Felony murder is defined, in relevant part, as "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . [a] robbery." T.C.A. § 39-13-202(a)(2). The only mental state required for felony murder is the intent to commit the underlying felony. T.C.A. § 39-13-202(b). When one defendant enters into a scheme with another to commit one of the enumerated felonies and a death ensues, all defendants are responsible for the death and may be convicted of felony murder regardless of who actually killed the victim or whether the killing was specifically contemplated by the other. *State v. Utley*, 928 S.W.2d 448, 451 (Tenn. Crim. App. 1995).

Aggravated robbery is a robbery accomplished with a deadly weapon or where the victim suffers serious bodily injury. T.C.A. § 39-13-402(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or by putting the person in fear." *Id*. § 39-13-401(a). Especially aggravated kidnapping is false imprisonment – the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty – where the act is accomplished with a deadly weapon or where the victim suffers serious bodily injury. T.C.A. §§ 39-13-302(a), -305(a)(1), (3).

Aggravated rape, as relevant here, is the unlawful sexual penetration of a victim by the defendant where force or coercion is used to accomplish the act and the defendant is armed with a weapon, causes bodily injury to the victim, or is aided or abetted by one or more other persons and force or coercion is used to accomplish the act. T.C.A. § 39-13-502(a).

*I. Criminal Responsibility*

Defendant contends that the State failed to prove that he acted with the requisite intent to establish criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2). Under the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App.

2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." *Id*. (citing *Ball*, 973 S.W.2d at 293).

Viewed in the light most favorable to the State, the evidence at trial showed that Defendant was part of the group that returned to Davidson's house in Ms. Christian's vehicle with Ms. Christian and Mr. Newsom blindfolded and restrained, and Defendant led Mr. Newsom into the house. Defendant was present in Davidson's roughly 800-square-foot house when both victims were raped. Dr. Mileusnic-Polchan testified that Mr. Newsom was raped one to two hours prior to his death, and Xavier Jenkins saw Ms. Christian's vehicle and the vehicle that Defendant was driving parked outside of Davidson's house at 12:30 a.m. After Mr. Newsom was raped, Defendant led him to Ms. Christian's vehicle, drove him to the railroad tracks, shot him three times, and set his body on fire. When he returned to Davidson's house, he told Davidson "that's taken care of." When Thomas, Cobbins, and Coleman expressed a desire to leave, Defendant told them they needed to wait and let them finish what they were doing. Defendant spent several hours inside Davidson's house knowing that Ms. Christian was confined to Davidson's bedroom, where she was being raped. Finally, Defendant took Davidson to Danielle Lightfoot's apartment, where they spent the night after the murders and after Davidson's photograph appeared on local news. Defendant and Davidson then broke into and hid inside a vacant house.

The jury could reasonably infer from the evidence presented at trial that Defendant acted with the intent to promote or assist the commission of all the conviction offenses.

*II. Corroboration of Accomplice Testimony*

When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). The Tennessee Supreme Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *Id*. (citing *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004); *Clapp v. State*, 94 Tenn. 186, 30 S.W. 214, 216 (1895)). The test for whether a witness qualifies as an accomplice is "'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'" *Id*. (quoting *Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964)). Here, there is no dispute that George Thomas was an accomplice as he was indicted for the same offenses charged against Defendant. *See State v. George Geovonni Thomas*, No. E2013-01738-CCA-R3-CD, 2015 WL 513583, at *1 (Tenn. Crim. App. Feb. 5, 2015), *perm. app. denied* (Tenn. Aug. 12, 2015).

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, "corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). Corroborative evidence must lead to the inferences that a crime has been committed and that the defendant is implicated in the crime. *Id*.

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *Bigbee*, 885 S.W.2d at 803). The corroborative evidence need not be "overwhelming." *Id*. In fact, "[o]nly slight circumstances are required to corroborate an accomplice's testimony." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997) (internal citations omitted). Whether sufficient corroboration exists is for the jury to determine. *Shaw*, 37 S.W.3d at 903.

We conclude that the State presented sufficient evidence to corroborate Thomas's testimony implicating Defendant in the commission of the conviction offenses. Thomas testified that Defendant was driving a white Pontiac on the night of the offenses and that Defendant was part of the group that brought the victims to Davidson's house. The State corroborated this testimony with the prior testimony of Ms. Mathis that Defendant borrowed her car, a white Pontiac Sunbird, on the weekend of the offenses. Defendant's DNA was found on a gun holster recovered from Ms. Mathis's vehicle. Xavier Jenkins identified Ms. Mathis's car as the car he saw parked directly behind Ms. Christian's Toyota 4Runner outside of Davidson's house on the night of the carjacking.

Thomas also testified that he accompanied Defendant when Defendant drove a bound and gagged Mr. Newsom to the railroad tracks, shot him three times, and then set

his body on fire. Thomas testified that Defendant made Mr. Newman walk barefoot from the vehicle to the railroad tracks, and Thomas saw three flashes. This testimony was corroborated by the testimony of Jerome Arnold that he heard three gunshots coming from the direction of the railroad tracks at 1:45 a.m. and forensic evidence showing that Mr. Newsom was shot three times and that his feet were covered in mud. Mr. Newsom's body was found beside the railroad tracks, severely burned, and he was bound and blindfolded and not wearing shoes.

Thomas testified that Defendant retrieved a gasoline can from the vehicle after killing Mr. Newsom and that he heard a "whoosh" shortly thereafter. This testimony was corroborated by forensic evidence showing that Mr. Newsom's body was doused in gasoline and burned. Ms. Mathis previously testified that she kept gas cans in the trunk of her vehicle, and police found a nearly empty gas can in the vehicle that she loaned to Defendant.

The jury reasonably determined that there was sufficient corroboration of Thomas's testimony. Evidence was presented, independent of Thomas's testimony, that "tends to connect [D]efendant with the commission of the offense." *See Bigbee*, 885 S.W.2d at 803. When viewed under the standards discussed above, we conclude there was sufficient evidence to corroborate Thomas's testimony regarding Defendant's role in the offenses. Defendant is not entitled to relief on this issue.

*Cumulative Error Doctrine*

Finally, Defendant contends that even if each of the errors alleged, standing alone, do not entitle him to a new trial, the cumulative effect of the errors deprived him of a fair trial. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Here, Defendant has failed to establish any individual error. No error renders the cumulative error doctrine barren.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE